635 So.2d 206 (1994)
Thomas WIMBERLY and Ruth Wimberly, Husband and Wife, Individually and on Behalf of the Minor Child, Brandon Wimberly
v.
Russell GATCH, Gerald Gatch and Mrs. Gerald Gatch.
No. 93-C-2361.
Supreme Court of Louisiana.
April 11, 1994.
Rehearing Denied May 12, 1994.
Aubrey Richard Snell, Steven Glenn McKenzie, for applicant.
Charles G. Tutt, Cook, Yancey, King & Galloway, James R. Phillips, Steven D. Crews, Watson, Murchison, Crews, Arthur & Corkern, for respondent.
James C. Gulotta, Jr., Paul J. Masinter, for W.R. Grace Co. (amicus curiae).
Harry Alston Johnson, III, for Louisiana Ass'n Defense Counsel (amicus curiae).
*207 ORTIQUE, Justice.[1]
We granted writ to determine whether the equitable doctrine of contra non valentem suspends the running of prescription until the parents of a sexually abused child learn about the molestation and/or the various types of molestation. The trial court declined to apply this equitable doctrine to suspend the running of the one year liberative prescriptive period for the three year period in which the young child was repeatedly sexually molested. Consequently, it found only the defendant's last act of molestation fell within the one year period and had not prescribed. The court of appeal affirmed. It determined the facts did not warrant application of the doctrine of contra non valentem since defendant did not harm or otherwise threaten the young child with physical violence to coerce his silence. We reverse.

I.
Brandon Wimberly, born June 18, 1977, was 9 years old when he was sexually abused by his older brother's Boy Scout leader, Michael Keys. A single, painful incident occurred wherein Keys grabbed Brandon's penis and threatened to pull it off. The fearful adolescent promptly told his father, Thomas Wimberly, even though Keys had warned him not to tell. Due to this incident, Brandon's parents placed him in weekly group therapy under social worker Charles Lee[2] in October, 1987.
The next month, Brandon disclosed to his therapy group that a 16 year old had ejaculated in his presence, but he denied having physical contact with him. In January, 1988, Brandon made a private disclosure to Lee about how a boy had put his mouth on his penis and bit. No names or timeframes were mentioned. Lee believed Brandon was relating a long-past event.
It was not until Monday, April 25, 1988, that Brandon first disclosed to Lee a single incident of oral sex had occurred over the previous weekend (April 22-24, 1988) with a young man named Russell Gatch ("Russell"), who was almost 18 (born July 3, 1970). Russell was a neighbor and a friend of Brandon's older brother. Lee promptly informed Brandon's parents, who were completely astounded by the disclosure.
The Wimberlys took Brandon to the Bossier City Police station that evening, but had to return two days later to meet with a juvenile division officer. The juvenile officer interviewed Brandon without his parents being present. His police report indicates that Russell had been performing oral sex on Brandon (by Russell placing his mouth on Brandon's penis), for a 3 year period at a place known to the neighborhood kids as the "trails." The report reflects that during the previous year, 10 to 15 incidents had occurred. The last occurrence, the single event Brandon described to Lee, happened when Brandon rode his bicycle past Russell's home and stopped to admire Russell's new automobile. Russell, who had been sitting on a porch swing, went to the bushes near his home and invited Brandon to join him. Russell then directed Brandon to remove his pants. Brandon complied. After the act was completed, Russell's mother discovered them in the bushes and inquired as to the nature of their activities. After she was given an excuse, she left. The police officer guesstimated this last act of molestation occurred between the dates of April 10-16, 1988. (Bossier City Police Offense Report No. 88-12485) The officer arrested Russell. His police report reflects that Russell admitted to the occurrence of the above described event, and admitted to four other incidents with Brandon. (Bossier City Police Offense Report No. 88-12485, supplement)
*208 Brandon's parents filed suit individually and on Brandon's behalf on April 21, 1989. Their original petition named as defendants Russell Gatch and his parents, Gerald and Shirley Gatch. It alleges that "for several months and years" Russell "used his size, age and certain scare tactics to sexually molest and abuse" Brandon. Their amended petition, filed on January 4, 1990, alleges that Russell placed fear in Brandon "to such an extent that the horror of the molestation under which [Brandon] suffered was suppressed inside of [him]." It asserts that after filing suit, they discovered more about the extensiveness of Russell's acts of oral sexual stimulation on Brandon. They learned the molestations commenced when Brandon was approximately 7 years old and continued until the date of Russell's arrest at a rate of approximately two times per week. They also learned (in November or December, 1989) that Russell sodomized Brandon on several occasions.[3]
Thereafter, defendants filed a peremptory exception raising the objection of prescription. Their exception asserts that Brandon's seventh birthday was on June 18, 1984; Russell was arrested on April 27, 1988; police records place the last act of molestation as occurring between April 10 and 16, 1988[4]; and plaintiff's original petition was filed on April 21, 1989. Consequently, under the one year liberative prescriptive period of LSA-C.C. art. 3492, defendants claim either all or most of the allegedly tortious conduct occurred more than one year prior to the filing of suit. They claim the alleged acts of sexual molestation were separate acts and not a continuing tort, citing Laughlin v. Breaux, 515 So.2d 480 (La.App. 1st Cir.1987) [woman's long-term physical abuse by boyfriend did not constitute a continuous tort; each incident of battery gives rise to a separate cause of action]. They also claim the doctrine of contra non valentem is not applicable as the abuse did not produce a mental incapacity rendering the plaintiff unable to file suit. Russell did not physically threaten Brandon, and the child admitted he knew the sexual acts were wrong.[5] Defendants claim *209 Brandon did not make an earlier disclosure merely because he was "afraid he would get in trouble or Russell would say he liked it."
Brandon's parents' opposition asserts that "the discovery rule"[6] suspended the commencement of prescription. They assert they had absolutely no knowledge of Russell's actions until April 25, 1988, when Brandon first disclosed to his therapist that he was being sexually abused by Russell and, in turn, the therapist informed them. They filed suit within one year of their discovery of any of the acts of molestation. Therefore, they contend filing was timely as to all their allegations. They further contend that, at 2½ years after filing suit, they were still discovering additional acts of molestation by Russell.
The deposition and live testimony introduced at the hearing on the exception reveals Russell has a history of sexually molesting young boys. He began molesting boys in the early 1980's in Bossier City before his family moved for a year and a half to Arkansas. He admitted to sexual acts with several boys in Arkansas, and to an arrest in that state on sexual molestation charges. Upon his return to Bossier City, he renewed his sexual acts with the young boys in Brandon's neighborhood. Russell admitted having oral and anal sex with Brandon and to having oral sex with Brandon's friends Jeremy, Corey and Chris. He could not remember whether he had group acts with Brandon and his friends, but Brandon recalled such acts occurring with Jeremy (Jason) and Chris. Russell also admitted to being caught with a boy at camp by his Scout Master, Mike Keys.
Lee indicated, in therapy, Brandon progressed as expected. He tried to develop trust and rapport with the other boys in his group, he "[d]id not disclose or open up immediately about what was going on with him, but sort of testing out, seeing where he fit in with the group setting at that time with the other boys." Lee said Brandon first divulged the abuse by Russell on April 25, 1988. Brandon told him he needed to talk privately about something over which he was very upset. Then Brandon revealed the single incident in Russell's yard which had occurred over the previous weekend. Lee said it was months before Brandon disclosed to him that the sexual acts with Russell had been a regular, on-going, almost daily occurrence. Lee related that Brandon did not tell him about the incidents with Russell before April 25, 1988 because "he was afraid to tell his parents." Brandon was afraid he would get into trouble or Russell would say he "liked it." Lee also said the longer Brandon was counseled, the more he revealed.[7] Lee said he believes the progression of the disclosures coincided with when Brandon perceived Russell was no longer a threat, such as when Russell moved out of the neighborhood. Lee said Brandon was "very scared" of Russell; he was afraid of retaliation.
Brandon, a seventh grader at the hearing held five years after his initial disclosure, informed the court he did not tell Lee earlier because Russell warned he would get into trouble with his parents if he told. He said *210 he told Lee on April 25, 1988, because Mrs. Gatch had seen him in the bushes with Russell. He was afraid of being caught, so he reported the incident after his next therapy session. Brandon described the earliest acts which occurred in his parents' home when he was 6 or 7 years old, and indicated that once he began riding his bike out on the trails, the wooded area by his subdivision, the molestations occurred almost daily. He explained he promptly told his father about the Keys incident, despite his fear of Keys, because Keys had hurt him.
The trial court found the last act of sexual molestation, the one in the bushes by the Gatch home, occurred on the weekend of April 22-24, 1987 and, therefore, had not prescribed. However, the trial court rejected the doctrine of contra non valentem on the basis of Crosby v. Keys, 590 So.2d 601, 602 (La.App. 2d Cir.1991), writ den., 593 So.2d 373 (La.1992),[8] and held that all acts of molestation occurring more than a year prior to the filing date of April 21, 1988 had prescribed, which encompassed all but the last act of molestation.
The court of appeal affirmed. 621 So.2d 633 (La.App. 2d Cir.1993). It held that, since Russell did not harm or otherwise threaten Brandon with physical violence in order to coerce his silence, Brandon's fear of his malefactor, alone, did not warrant application of the exceptional doctrine of contra non valentem.[9] 621 So.2d at 637. In the per curiam issued in conjunction with the denial of Russell's application for rehearing, the appellate court affirmed the trial court's determination that the last act of sexual abuse transpired during the weekend before April 25, 1988. 621 So.2d at 637, 638 (La.App. 2d Cir.1993).
We granted the Wimberlys' application for certiorari, 629 So.2d 1141 (La.1993), to determine whether the facts of this case warrant the application of the juridically created doctrine of contra non valentem.[10]

II.
Liberative prescription runs against all persons unless exception is established by legislation. LSA-C.C. art. 3467. It runs against absent persons and incompetents, including minors and interdicts, unless exception is established by legislation. LSA-C.C. *211 art. 3468. The one year liberative prescription period for delictual actions begins to run from the date the injury or damage is sustained. LSA-C.C. art. 3492. This prescription statute, like all others, is strictly construed against prescription and in favor of the obligation sought to be extinguished by it. Bouterie v. Crane, 616 So.2d 657 (La. 1993); Bustamento v. Tucker, 607 So.2d 532 (La.1992); Lima v. Schmidt, 595 So.2d 624 (La.1992); Foster v. Breaux, 263 La. 1112, 270 So.2d 526 (1972).
When a petition reveals on its face that prescription has run, the plaintiff has the burden of showing why the claim has not prescribed. Bouterie v. Crane, supra; Lima v. Schmidt, supra. The plaintiff has three theories upon which he may rely to establish prescription has not run, to wit, suspension, interruption or renunciation. Id. The Wimberlys herein rely on the suspensive theory of contra non valentem agere nulla currit praescripto, which means "prescription does not run against a party unable to act."
The courts created the doctrine of contra non valentem, as an exception to the general rules of prescription. Hillman v. Akins, 631 So.2d 1 (La.1994); Bouterie v. Crane, supra; Harvey v. Dixie Graphics, Inc., 593 So.2d 351 (La.1992); Plaquemines Parish Com'n Council v. Delta Development Co., Inc., 502 So.2d 1034, 1054 (La.1987). The doctrine is contrary to the express provisions of the Civil Code. See LSA-C.C. art. 3467; Bouterie v. Crane, supra; Plaquemines Parish Com'n Council v. Delta Development Co., Inc., supra. The principles of equity and justice which form the mainstay of the doctrine, however, demand that under certain circumstances, prescription be suspended because plaintiff was effectually prevented from enforcing his rights for reasons external to his own will. Bouterie v. Crane, supra; see Plaquemines Parish Com'n Council v. Delta Development Co., Inc., supra; Corsey v. State, through Dept. of Corrections, 375 So.2d 1319 (La.1979).
Generally, the doctrine of contra non valentem suspends prescription where the circumstances of the case fall into one of the following four categories:
1. Where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action;
2. Where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting;
3. Where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and
4. Where some cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.
Rajnowski v. St. Patrick's Hospital, 564 So.2d 671, 674 (La.1990); Whitnell v. Menville, 540 So.2d 304 (La.1989); Plaquemines Parish Com'n Council v. Delta Development Co., Inc., supra; Corsey v. State, through Dept. of Corrections, 375 So.2d at 1321-1322; but see Bouterie v. Crane, supra [Bouterie's claim did not squarely fit into any of these 4 categories but was closely analogous to the second category; therefore, prescription was suspended.[11]].
The first two categories of the doctrine are not relevant to this case and, therefore, are not further discussed. The third and fourth categories are both relevant. The third category applies to cases where defendant engages in conduct which prevents the plaintiff from availing himself of his judicial remedies. Corsey v. State, through Dept. of Corrections, supra; Whitnell v. Menville, supra; Plaquemines Parish Com'n Council v. Delta Development Co., Inc., supra. The cause of action accrued, but plaintiff was prevented from enforcing it by some reason external to his own will. Corsey v. State, through Dept. of Corrections, supra. The fourth category, commonly known as the discovery rule, provides that prescription commences on the date the injured party discovers or should have discovered the facts upon which his cause of action is based. Griffin v. Kinberger, 507 So.2d 821 (La.1987); Lott v. Haley, 370 So.2d 521 (La.1979). Hence, prescription *212 does not accrue as it does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligent or unreasonable. In Re Medical Review Panel of Howard, 573 So.2d 472 (La.1991); Young v. Clement, 367 So.2d 828 (La.1979).
The doctrine of contra non valentem distinguishes between personal disabilities of the plaintiff (which do not prevent prescription from running) and an inability to bring suit for some cause foreign to the person of the plaintiff (which suspends its running). Id. The equitable doctrine is, in part, but an application of the long-established principle of law that one should not be able to take advantage of one's own wrongful act. Nathan v. Carter, 372 So.2d 560 (La.1979).

III.
Defendants claim the trial court correctly sustained their exception of prescription because Russell's alleged tortious conduct did not produce a mental and physical incapacity in Brandon rendering him unable to file suit. They suggest that, although Brandon may justifiably have felt fear and embarrassment over the alleged incidents, he retained sufficient mental and psychological capacity to inform others of the acts, citing as authority Laughlin v. Breaux, supra[12]; Bock v. Harmon, 526 So.2d 292 (La.App. 3d Cir.1988), writ den., 531 So.2d 275 (La.1988)[13]; Doe v. Ainsworth, 540 So.2d 425 (La.App. 1st Cir. 1989), writ den., 542 So.2d 511 (La.1989)[14]; Crosby v. Keys, supra[15]. See also Fontaine v. Roman Catholic Church of Archdiocese of New Orleans, 625 So.2d 548 (La.App. 4th Cir.1993), writ den., 630 So.2d 787 (La.1994). But see Held v. State Farm Ins. Co., 610 So.2d 1017 (La.App. 1st Cir.1992), writ den., 613 So.2d 975 (La.1993)[16]. All of these cases involve majors, persons of legal age filing suit on their own behalf against the defendant *213 tortfeasors. Thus, none are dispositive of the principal issue involved herein.

IV.
Adults frequently have preconceived ideas about how a traumatized person will react after infliction of the trauma. See Elias, Hon. Harry M., Commentary: "Abuse of the Child Sexual Abuse Accommodation Syndrome," 1(4) Journal of Child Sexual Abuse 169, 170 (1992). The child victim of sexual abuse does not react to the situation according to adult concepts of self-determinism with autonomous, rational choices. Summit, Roland C., "The Child Sexual Abuse Accommodation Syndrome," 7 Child Abuse & Neglect 177, 179 (1983), hereafter Summit 1. In fact, their behavioral patterns vastly differ from adult expectations.
The behavioral dynamics of child sexual abuse victims was initially published in 1983 by Dr. Roland C. Summit in his paper, The Child Sexual Abuse Accommodation Syndrome. Summit 1, supra. The syndrome, known as CSAAS, does not describe symptoms or personality traits. Instead, it sets forth the dynamics of child sexual victimization to explain how children react differently to molestation than adults expect. See Summit, Roland C., "Abuse of the Child Sexual Abuse Accommodation Syndrome," 1(4) Journal of Child Sexual Abuse 153, 155 (1992), hereafter Summit 2.
CSAAS is a clinical opinion summarizing the behavioral patterns seen frequently by those who work with victims of child sexual abuse. See Summit 2, 1(4) Journal of Child Sexual Abuse at 156-157; Salter, Anna C., "Response to the `Abuse of the Child Sexual Abuse Accommodation Syndrome,'" 1(4) Journal of Child Sexual Abuse 173, 175 (1992). It "represents a common denominator of the most frequently observed victim behaviors." Summit 1, 7 Child Abuse & Neglect at 180. It is not diagnostic. Summit 2, 1(4) Journal of Child Sexual Abuse at 157; Elias, 1(4) Journal of Child Sexual Abuse at 169, 170; Meyers, Bays, Becker, Berliner, Corwin and Saywitz, "Expert Testimony on Child Sexual Abuse Litigation," 68 Neb.L.Rev. 1, 67 (1989). Thus, CSAAS does not prove a child has been abused. Its use is to educate adults about child victims as a class, describing the child's reality in order to prevent a secondary victimization of the child.[17]See Summit, R.C., "The Rehabilitation of the Child Sexual Abuse Accommodation Syndrome in Trial Courts in Kentucky: Commentary," 1(4) Journal of Child Sexual Abuse 147, 148 (1992), hereafter Summit 3. It describes a behavioral pattern of "normal children making normal adjustments to an abnormal environment." Summit 2, 1(4) Journal of Child Sexual Abuse at 158.
Summit indicates that the child victim has a "tendency to deal with the trauma as an intrapsychic event and to incorporate a monstrous apparition of guilt, self-blame, pain and rage." Summit 1, 7 Child Abuse & Neglect at 179. Studying large numbers of children in proven abuse cases, he found their actions contradicted traditional views. Id. He found certain behavioral patterns "of mutually dependent variables" which helped the child cope for the moment but tended "to isolate the child from eventual acceptance credibility or empathy within the larger [adult] society." Id. He asserts that awareness of these behavioral patterns provides "a counterprejudicial explanation to the otherwise self-camouflaging and self-stigmatizing behavior of the victim." Id.
CSAAS has five categories, into which an infinite number of behavioral variations can be subsumed. Summit 2, 1(4) Journal of *214 Child Sexual Abuse at 162. Secrecy and helplessness are the two precondition categories to the occurrence of child sexual abuse. Summit 1, 7 Child Abuse & Neglect at 181. The three sequential contingency categories are entrapment and accommodation; delayed, conflicted and unconvincing disclosure; and retraction. Id.; 68 Neb.L.Rev. at 66. While Brandon's behavior may or may not encompass all five categories of CSAAS, the precondition category of secrecy and the sequential category of delayed, conflicted and unconvincing disclosure are the two most pertinent to defendants' exception of prescription. As they are definitive of the issues involved in this case, they are the only two CSAAS categories detailed below.
Concerning secrecy, Summit declares that "[s]ilence is intrinsic to the victimization process" in all types of child sexual abuse (incestuous, non-incestuous).[18] Summit 2, 1(4) Journal of Child Sexual Abuse at 159. "The average child never asks and never tells." Summit 1, 7 Child Abuse & Neglect at 181. Thus, he found that,
Contrary to the general expectation that the victim would normally seek help, the majority of the victims in retrospective surveys had never told anyone during their childhood. Respondents expressed fear that they would be blamed for what had happened or that a parent would not be able to protect them from retaliation ... Id.

Summit indicated a vast majority of child sexual abuse victims were less than 8 years old at the time of the initial molestation. Id., at 178. Furthermore, he indicated young male victims are even more secretive than young female victims of child sexual abuse, as they are extremely reluctant to admit to the sexual victimization experience. Id., at 180.
Summit described the sexually abused child as being "most fearful, tentative and confused about the nature of the continuing sexual experience and the outcome of disclosure." Id., at 178. Thus, regarding disclosure, he found treated, reported and investigated cases the exception, not the norm. Id., at 186. This phenomenon runs afoul to the commonly held adult perception myth that the child victim of sexual abuse will immediately disclose the abuse.
The interdisciplinary group of authors of "Expert Testimony in Child Sexual Abuse Litigation"[19] conclude, "[m]ost victims of child sexual abuse never disclose their abuse. Of those that do, delay in reporting is very common." 68 Neb.L.Rev. at 86. They found,
When disclosure occurs, the child may refrain from telling the entire story, and may reveal a little at a time to "test the waters" and see how adults react. For example, a young child who has been penetrated many times may begin by saying, "He only did it once." Or, "He never put it in me, he just touched me with it." Or, "He only did it to other kids, not to me." Such disclosures are inaccurate, of course, but considering the child's uncertainty, and the common belief among children that adults will perceive them as bad because they were victimized, such behavior is understandable. Id., at 87.
Dr. Anna Salter, a Summit advocate, further rebuts the "immediate disclosure" myth contending "there is not a shred of positive evidence to suggest that the majority of sexually abused children disclose immediately after abuse, nor even that they disclose at all." Salter, Anna C., "Response to the `Abuse of the Child Sexual Abuse Accommodation Syndrome,'" 1(4) Journal of Child Sexual Abuse 173, 176 (1992). She documents *215 her postulate with the following research:
Finkelhor (1979) found that 63% of his sample of 530 college women and 73% of 266 college males had never told anyone about the sexual abuse before the researchers, much less disclosed to anyone in a position of authority when they were children. Russell (1984) found that only 5% of the 647 cases of child sexual abuse in her sample were ever reported to the police. Donaldson (1983) found that 70% of her sample of adult survivors never told anyone about their abuse as a child. The Los Angles Times study (Timnick, 1985a; 1985b) found that fewer than ½ of the children told anyone about the abuse within a year. Only 3% reported it to the police or a public agency. By the time of the study, when all the victims were adults, a full 1/3 had never told anyone about the abuse until they spoke to the researchers. Id., at 173.[20]
Thus, she contends that,
If anything, the research is quite consistent that not disclosing appears to be the normative for child sexual abuse. In fact, this author knows of no studies which have found that the majority of children disclose child sexual abuse in childhood, much less immediately after the abuse.
Mark Twain once wrote of the myth that when a fact and theory collide, the theory will give way. Not so, he felt the fact would give way every time. With methodologically sound research studies finding as many as 38% of female victims of child sexual abuse (Russell, 1984; Salter, 1992), with estimates of as many as 38 million sexually abused Americans (Crewdson, 1988), and with clear and convincing evidence that the majority of those children do not disclose, one must wonder indeed at a society which requires expert witnesses to explain the "unusual" phenomena of delayed disclosure. On what basis then does this society expect that children will report sexual abuse directly and immediately, in a non-confused and convincing way without restrictions? (Emphasis added) Id., at 174.
The validity of CSAAS was sanctioned by this court in State v. Foret, 628 So.2d 1116 (La.1993). Recognizing that CSAAS is not diagnostic and, therefore, not probative of abuse, this court held the CSAAS cannot be used in criminal actions to determine the credibility of the child victim witness' claim of abuse. 628 So.2d at 1130; see 628 So.2d at 1124. Nonetheless, this court determined CSAAS-based evidence should be admissible for the limited purpose of explaining, in general terms, certain reactions of a child to sexual abuse like delayed reporting and recantation, when the child victim/witness' credibility is attacked, i.e., using CSAAS evidence on rebuttal to rehabilitate the child victim's credibility when attacked for nonconformance to adult expectations on victimization and the reporting of the abuse. 628 So.2d at 1131. The circumstances of this case present an additional use of the CSAAS.
Cognizant of the CSAAS and educated by it, this court refuses to perpetuate the myths it debunks, or reward the molester by allowing him to profit by the normal behavioral reactions of his victim to the sexual abuse. The syndrome explains that due to self-blame, fear of blame, retaliation, et certa, the normal child victim of sexual abuse is likely to never disclose, not immediately disclose or partially disclose the extent or frequency of their involvement in the sexual abuse. Understanding that secrecy and that delayed, conflicted and unconvincing disclosure are the norm and that immediate disclosure is atypical, in civil actions, the child victim's delayed or partial disclosure will not be countenanced, in law or equity, to victimize the child a second time.

V.
Although an unemancipated minor might have a right of action against a tortfeasor to *216 recover for injuries, the unemancipated minor does not have procedural capacity to sue. LSA-C.C.P. art. 683(A); Bouterie v. Crane, supra; Garrett v. Earnest, 376 So.2d 623 (La.App. 4th Cir.1979). Instead, the minor's father (or mother, under certain contingencies) is the proper party plaintiff to sue to enforce the right of the unemancipated minor who is the legitimate issue of living parents, not divorced or judicially separated. LSA-C.C.P. art. 683(C). Thus, under Louisiana's legal framework, only Brandon's father ("parents") had capacity to sue for Russell's sexual abuse of Brandon. Yet, due to no fault of their own, Brandon's parents had no knowledge of any of the molestations by Russell until April 25, 1988.
When molested by Keys, Brandon promptly informed his father because he feared for his safety. He apparently had not acquiesced to the sexual encounter with Keys and felt limited or no self-blame. In contrast, he remained typically silent about his participation in his protracted relationship with Russell which commenced in his bedroom when he was 6 or 7 years old. If he reacted to the situation like a normal sexually abused child, Brandon heaped upon himself "a monstrous apparition" of guilt and self-blame, and was very reluctant to admit to the victimization experience. Brandon said he remained silent because he feared Russell would say he liked it, and because of fear of parental condemnation. His impetus to confess was the fear that Mrs. Gatch had caught him in the act. It was inconsequential that Russell did not physically threaten or coerce Brandon's silence, or that Brandon realized (because some of the sexual acts occurred behind a closed door) the conduct was wrong. Brandon kept the liaison secret for three years because he is a normal child who reacted to the sexual abuse in a normal manner.
Brandon's mother, Rusty, stated that when Brandon began therapy, they attributed his fears and emotional damage to the Keys incident. They continued to place the fault on Keys for much of the year following Brandon's April 25, 1988 disclosure. It was not until they learned the true extent and pervasiveness of Brandon's relationship with Russell that they realized Russell was the root of Brandon's emotional damage. Apparently, it was only through long-term therapy, and after Russell moved out of the neighborhood (and/or was incarcerated), that Brandon's fear abated and he opened-up about the abuse.
Thus, for reasons external to their own will, the proper party plaintiffs did not discover Russell's intentionally tortious conduct. Due to two normal behavioral reactions of a sexually abused child to the sexual abuse, secrecy and delayed disclosure, Brandon's parents were effectually prevented from pursuing both his and their own claims for damages against defendants. The law does not impute Brandon's parents with the knowledge held by their sexually abused minor child. Public policy enjoins legal fictions like imputation of knowledge from operating to assist a child molester in escaping liability for his intentional wrongs. That mechanism was confected to achieve justice, not inhibit it. As their actual lack of knowledge and their failure to discover the abuse were both direct results of Russell's intentionally tortious conduct, a combination of the principles behind the third and fourth categories of contra non valentem, suspended prescription from running on their claims until Brandon disclosed the abusive acts.
In Corsey, supra, a case in which a prisoner at the state penitentiary was mentally incapacitated as a result of defendant's tortious conduct, this court found the third category of contra non valentem suspended the running of prescription. That case also presented the unusual situation where the same wrongdoing which gave rise to the cause of action made it impossible for the plaintiff to avail himself of his legal remedy, in contrast to the usual situation where the conduct of the defendant preventing plaintiff from filing suit is conduct separate from the wrongful conduct giving rise to the claim. Corsey v. State, through Dept. of Corrections, 375 So.2d at 1323-1324. In explanation of its decision to apply the third category of the doctrine of contra non valentem to Corsey's situation, this court quoted Justice Provosty in Hyman v. Hibernia Bank & Trust Co., *217 139 La. 411, 71 So. 598, 600 (1916), wherein he wrote that an
"exception must be recognized, we think, in a case like the present, where the inability of the plaintiff to act was brought about by the practice of the defendant. Otherwise, the defendant would be profiting by their wronga thing inadmissible in law." Id., at 375 So.2d at 1324.
Like the plaintiff in Corsey, Brandon's parents were unable to file suit due to the effects of defendant's tortious conduct. Brandon's reaction to the sexual abuse, his silence, accommodated Russell in the commission of the tort and in its tardy detection. An artifice for the child molester is the likelihood that his victim will not divulge the abuse, but will keep it secret. Whether or not Russell actually knew Brandon was not likely to tell, merely because that reaction is normal for a sexually abused child, the behavioral probability worked to his advantage. The behavioral dynamics of the victimization facilitated both the continuation of Russell's abusive acts and the unlikelihood of early detection. Hence, as in Corsey, equity demands the employment of the third category of contra non valentem to prevent defendants from profiting from their own wrong.
The liberative prescription provisions of our Civil Code are not meant to assist the intentional tortfeasor in escaping accountability for his wrongful actions. A direct result of Russell's intentionally tortious conduct prevented the proper party plaintiffs from discovering any of the facts upon which their causes of action are based until April 25, 1988. Prescription could not commence running until that date. The discovery rule of the fourth category of contra non valentem prevents prescription from running against one who is ignorant of the facts upon which his cause of action is based when there is a reasonable cause for the ignorance. Thus, a combination of the third and forth categories of the equitable doctrine suspended the running of prescription to prevent defendants from profiting from Russell's wrongful conduct.
Consequently, since suit was filed within one year of the discovery date of April 25, 1988, none of plaintiffs' claims prescribed.[21]

VI.
At the trial level, defendants contended that the alleged acts of sexual molestation were separate acts and not a continuing tort. In support of their position they cited Laughlin v. Breaux, wherein the plaintiff allegedly had been beaten, raped and verbally abused on numerous occasions over a 2 to 3 year period by her ex-boyfriend.[22] Therein, the appellate court found defendant's actions did not constitute a continuing tort since the principle applies only where "continuous conduct causes continuing damages." (emphasis in original) 515 So.2d at 482, citing South Central Bell Telephone Co. v. Texaco, Inc., 418 So.2d 531 (La.1982). The court stated "each incident of battery and assault is separate, and gives rise to a separate cause of action." Id. Thus, it found prescription ran from each act of abuse "even though several different incidents of abuse may have combined to produce Plaintiff's Battered Woman's Syndrome." 515 So.2d at 483. Compare Bustamento v. Tucker, 607 So.2d 532, 542 (La.1992) [in an employee suit for intentional infliction of mental distress for sexual harassment against the employer, a supervisor and a co-worker, prescription did not commence running until the last act occurs or conduct is abated, where acts "are continuous on almost a daily basis, by the same actor, of the same nature, and the conduct becomes tortious and actionable because of its continuous, cumulative, synergistic nature"].
Without delving into whether the circumstances of this action constitute a continuing tort, this court notes that, due to the peculiarities of the CSAAS, though a parent may have discovered the date the continuous sexual misconduct abated, the parent may not *218 have discovered much else. Thus, classifying child molestation relationships as a continuing tort could be inequitable to the victim and the plaintiff parents. Instead, a type of discovery rule works best, as it suspends the running of prescription until the child victim's parents learn of the abuse, the extent of the abuse and the various forms of the abuse. In other words, because the child victim may initially make only partial or limited disclosures about the number of occurrences or types of abuse, the tortious conduct could spawn more than one prescriptive period. For example, as Brandon's parents learned of the last single act of oral sexual abuse on X date, learned there was a long-term oral sexual relationship on Y date; then learned of acts of sodomy on Z date, each discovery could involve the commencement of separate prescriptive periods. They might have declined to file suit over the oral types of molestation and allowed those claims to prescribe, but timely filed suit for the sodomy molestations. However, since Brandon's parents did in fact file suit timely after their initial discovery of the molestations (and have supplemented their petition upon discovering additional acts of abuse), all their prescriptive periods are subsumed into the one and the dates of their subsequent discoveries are not relevant.

DECREE
For the reasons assigned, the judgment sustaining the exception of prescription as to all acts occurring more than a year prior to the filing date of the suit is vacated, and the case is remanded for further proceedings not inconsistent with the principles enunciated herein. Costs are assessed against defendant respondents.
REVERSED AND REMANDED.
WATSON, J., concurs believing this was a continuing tort under BUSTAMENTO.
LEMMON and KIMBALL, JJ., concur and assign reasons.
KIMBALL, Justice, concurring.
While I concur in the result reached by the majority, I disagree with that part of the majority opinion which, unnecessarily in my view, creates a new category of contra non valentem by utilizing a combination of the principles behind the third and fourth categories of that doctrine to hold that prescription has not accrued on plaintiffs' claims in this case. Given the extensive discussion of CSAAS contained in the majority opinion, I find it unnecessary to blur the heretofore distinct requirements of the third and fourth types of the doctrine to reach the correct result in this case. The dynamics of CSAAS, as set forth in Section IV of the majority opinion, provide an ample basis for holding that plaintiff Brandon Wimberly was effectually prevented by the acts of defendant Russell Gatch from availing himself of his cause of action.
LEMMON, Justice, concurring.
Under the discovery rule of the fourth category of the doctrine of contra non valentem, prescription is suspended when the cause of action is not known or reasonably knowable by the creditor, as long as the ignorance is not willful, negligent or unreasonable. Young v. Clement, 367 So.2d 828 (La.1979). And when the tort victim is a minor who cannot himself bring the action because of lack of procedural capacity, prescription only begins to accrue when the person in authority over the minor reasonably discovers the existence of the cause of action.
The critical issue in this case is the determination of when the cause of action was reasonably knowable or should reasonably have been discovered. In making this determination, courts have focused on the reasonableness of the creditor's (or the creditor's representative's) action or inaction under the particular circumstances. Jordan v. Employee Transfer Corp., 509 So.2d 420 (La. 1987); In re Medical Review Panel of Howard, 573 So.2d 472 (La.1991).
Here, when the minor's parents learned of an isolated instance of sex abuse by the scout leader, they reasonably placed him in weekly therapy sessions in October, 1987. Of course, this knowledge did not reveal a cause of action against Gatch.
*219 In the next three months, the therapy sessions uncovered one other instance of sexual misconduct in the minor's presence and another direct incident involving an unknown offender at an undisclosed remote time. The parents reasonably continued the minor in periodic therapy sessions for his own well-being, and this was the most reliable source from which information about this single incident and about additional incidents, if any, might be forthcoming. This action or inaction by the parents was entirely reasonable at the time and under the circumstances.
The sexual abuse inflicted by Gatch on the minor during the weekend prior to April 25, 1988 prompted the minor to disclose to the therapist the prolonged history of such abuse, and the therapist immediately informed the minor's parents. It was at this point in time that prescription began to accrue because inaction by the parents in the light of these circumstances would have been unreasonable. The parents' filing suit within the year following April 25, 1988 interrupted prescription which had been suspended during the 1985-to-1988 period while the cause of action was not known or reasonably knowable by the minor's representatives. This interruption applied to all incidents alleged in this action, and the majority has properly overruled the exception of prescription.
NOTES
[1] Marvin, C.J., of the Court of Appeal, Second Circuit, sitting pro tempore for Dennis, J. Pursuant to Rule IV, Part 2 § 3, Marvin, C.J., is not on the panel which heard and decided this case.
[2] Charles Lee, who has a Masters in Social Work, is the director of clinical services for CPC Brentwood Hospital and for the Schumpert Psychiatric Department at the Schumpert Medical Center. He was accepted at trial of the peremptory exception of prescription as an expert in the field of social work, providing individual, family and group psychotherapy, and clinical assessment of a person's emotional and behavioral state.
[3] In his deposition, dated December 6, 1989, Brandon testified as follows:

Q. Has he [Russell] ever hit you, or hurt you in any way?
A. no sir. He has hurt me before. He when hehe has took his penis and put it in my hind.
Q. All right. Let's
A. and it hurt when he pushed.
Q. Well, how many times did he do that, now?
A. I don't recall.
Q. Is it more than one?
A. Yes, sir.
Q. Is it more than ten?
A. I don't recall.
Q. Okay. Do you recall when it started?
A. Mostly when we was in the woods.
Q. Okay. How long
A. where I can lay on a log.
A. He started this when he first chopped down those woods, that when I started ridingmy mom first let off (sic) in the woods.
Q. So how old were you then?
A. When I was about eight or nine.
Q. So, he started the sexual molestation with his penis in your behind when you were eight or nine?
A. Yes, sir. When I can go down in the woods. He never started it when I was at home.
[4] The memorandum in support of the exception stated that Russell Gatch was charged by bill of information with the crime of oral sexual battery committed against Brandon Wimberly between April 10 and 16, 1988, in the 26th J.D.C., Parish of Bossier, No. 66398. Russell pled guilty to the charge.
[5] In his deposition, dated December 6, 1989, Brandon at age 11 testified concerning his reaction to his initial sexual encounter with Russell, when he was age 6 or 7, as follows:

Q. Did you tell anybody what had happened?
A. No, sir.
Q. Was that because you didn't really know anything had happened?
A. No, I was scared.
Q. You were scared. Why were you scared?
A. Because I knew it was wrong. Someway, I knew it was wrong.
Q. You just, inside you
A. and he shut the door. And my parents told me not to shut the door.
Q. Did they tell you not to shut the door when somebody else was in the house, or?
A. No, just, I am not allowed to shut my door period.
Q. At all?
A. Yeah.
Q. And you just felt inside you
A. yeah, it was wrong.
Q. Did you feel that at the time this was happening, or?
A. No.
Q. It was afterwards, when you got to thinking about it
A. yeah.
Q. you just felt it was wrong?
A. Uh-huh. (Affirmative)
Q. Did you tell anybody?
A. No, sir.
Q. And, once again, the reason you didn't say anything to anybody was not because Russell had threatened you in any way on that first occasion, was it?
A. Repeat your question.
Q. On the first occasion, the reason you didn't tell anybody wasn't because Russell has threatened you? In other words, he hadn't threatened you to make you not tell anybody?
A. No he didn't threaten me.
[6] The discovery rule is addressed in detail, infra, pp. 211-212.
[7] Charles Lee testified further about Brandon's rate of disclosure at the hearing on the exception as follows:

Q. All right. If you had to classify that as whether or not it was a classic example of children who have been in childhave been abused sexually, would you say that that was classic
A. Well
Q. that the more you have therapy with them, the more they finally disclose?
A. I would say that is generally true as they develop trust with the therapist as they deal with fear around retaliation. It's more common that over time they'll gradually disclose more and more than that they will come in and disclose everything that occurred early on.
[8] On supervisory review, the appellate court in Crosby observed in dicta that the doctrine of contra non valentem was not applicable to plaintiff's suit against defendants, the scoutmaster Michael Keys and the Boy Scouts of America, Inc., for defendants' alleged failure to warn or protect plaintiffs from acts of sexual abuse. It stated that, even though the alleged acts of sexual abuse may have caused psychological injury, contra non valentem should not be applied where there is no evidence that the defendants took any action to prevent the plaintiffs from filing suit, citing Doe v. Ainsworth, 540 So.2d 425 (La.App. 1st Cir.1989), writ den., 542 So.2d 511 (La.1989); Bock v. Harmon, 526 So.2d 292 (La.App. 3d Cir.1988), writ den., 531 So.2d 275 (La.1988). This court denied supervisory writ, 593 So.2d at 373, with Calogero, C.J., and Lemmon, J., concurring "noting that the issues treated in dicta by the court of appeal may be reraised in the event of an appeal of the judgment after trial on the merits."
[9] The appellate court also rejected the Wimberly's argument that the 1992 amendment to LSA-C.C. art. 3496.1 should be retroactively applied to this case. As amended by Acts 1992, No. 322, that provision provides as follows:

Art. 3496.1. Action against a person for abuse of a minor
An action against a person for abuse of a minor is subject to a liberative prescriptive period of three years. This prescription commences to run from the day the minor attains majority, and this prescription for all purposes, shall be suspended until the minor reaches the age of majority. This prescriptive period shall be subject to any exception of peremption provided by law.
[10] Writ was granted primarily to address the applicability of contra non valentem to the circumstances presented in this case. As that issue is dispositive, discussion of the retroactive application of Acts 1992, No. 322, amending LSA-C.C. art. 3496.1 and/or the retroactive application of Acts 1993, No. 694, amending LSA-R.S. 9:2800.9, is pretermitted. LSA-R.S. 9:2800.9, as amended, provides in pertinent part as follows:

§ 2800.9. Action against a person for abuse of a minor
A. An action against a person for sexual abuse of a minor is subject to a liberative prescriptive period of ten years. This prescription commences to run from the day the minor attains majority, and this prescription shall be suspended for all purposes until the minor reaches the age of majority. Abuse has the same meaning as provided in Louisiana Children's Code Article 603(1)(c). This prescriptive period shall be subject to any exception of peremption provided by law.
[11] Note that, in an apparent response to Bouterie, the legislature amended LSA-C.C.P. art. 683 by adding § D approximately 10 weeks after the opinion was rendered.
[12] In Breaux, the major plaintiff's primary contention was prescription had not run on all of her claims of abuse due to the doctrine of contra non valentem. She claimed she was unable to file suit since she suffered from Battered Woman's Syndrome. Her treating psychologist testified she displayed the characteristics of the syndrome, including "learned helplessness," a type of passivity. The First Circuit determined that symptom, alone, was insufficient to suspend prescription under contra non valentem. In finding the evidence insufficient to establish that defendant's conduct produced an incapacity in plaintiff rendering her unable to file suit, the court noted that plaintiff was running her own business, had discussed the situation with friends, counselors and her psychologist, and had called the police on defendant. 515 So.2d at 480. Plaintiff did not apply to this court for writ of certiorari to review the correctness of the appellate court decision.
[13] In Bock, defendant's former wife and children sued him for 6 years of sexual abuse in which defendant allegedly gave his children drugs and alcohol, committed various sexual acts upon them, in private and in front of each other, and enticed them into performing numerous sexual acts upon him and each other. Therein, the trial court sustained defendant's exception of prescription against the major son since suit was filed 2½ years after the son attained majority. (Prescription was suspended as to the claims against the father during the son's minority.) The son claimed he was unable to file suit before his father was arrested on charges of sending pornography through the U.S. mail due to embarrassment, fear of ridicule, limited recall from the drug use, a distorted view of his father's power and accountability, and ignorance of the law. The court of appeal nonetheless declined to apply the third category of contra non valentem and affirmed the trial court's judgment sustaining the exception because it found the father took no affirmative overt action to prevent the son from filing suit and the son was fully aware of the illegality and perverse nature of the things his father did.
[14] In Doe, the major plaintiff filed suit against his former minister based on 4 alleged acts of sexual molestation which occurred 6 years earlier when plaintiff was 15 to 16 years old. Plaintiff claimed the minister had a psychic, spiritual and sexual control over him which suppressed his ability to perceive defendant's wrongful conduct. In declining to apply the third category of contra non valentem, the appellate court noted that 3 years before plaintiff filed suit, plaintiff discussed his homosexual experiences with both his parents and psychiatrist and, the following year, plaintiff had defendant perform his wedding ceremony. The appellate court, therefore, affirmed the trial court's finding that the evidence failed to disclose any action by or on behalf of defendant which restrained plaintiff from filing suit.
[15] See note 8, supra.
[16] In Held, 3 years after the plaintiff daughter attained majority she filed suit against her father for his alleged continuous sexual molestation of her for a 6 year period, from the time she was 12 to 18 years old. (Prescription was suspended as to the claims against the father during the daughter's minority.) The appellate court reversed the trial court judgment sustaining defendant's exception of prescription finding 2 categories of contra non valentem suspended the running of prescription. The court found plaintiff's post-traumatic stress disorder prevented her from acting until she knew she was completely innocent and her father was solely responsible, triggering the third category, and her parents' refusal to continue to pay for her therapy triggered the second category.
[17] Summit asserts that "CSAAS is socially, not clinically, determined. It reflects the pathology not of a child who can't convince us of his or her experience, but of an adult society which won't be convinced." Summit, R.C., "The Rehabilitation of the Child Sexual Abuse Accommodation Syndrome in Trial Courts in Kentucky: Commentary," 1(4) Journal of Child Sexual Abuse 147, 148 (1992), Summit 3.
[18] Summit writes:

Experts who swear that a child would have no reason to conceal abuse by a teacher must be unimpressed by a case in Great Neck, N.Y., where a computer teacher enslaved some 400 boys and girls in pornographic exploitation and sadistic abuse over a span of 7 years with no disclosures, ever. Or the school bus driver in the same county who molested children going back and forth to school. Some 250 young children entered a bus twice a day to be molested, yet no parent or teacher heard a word of that ordeal." Summit 2, 1(4) Journal of Child Sexual Abuse at 159.
[19] The authors of the article are a social worker, two psychologists, a pediatrician, a child psychiatrist and an attorney.
[20] Dr. Slater also wrote:

Saywitz, Goodman, and Moan (1991) found that, a sample of 36 children given vaginal and anal exams as part of a medical check-up, 78% failed to disclose the vaginal exam under free recall conditions and 89% failed to disclose the anal exam. This was particularly striking since it was under conditions in which no secrecy was implied or requested, no threats or pressure were employed, and the children were asked specifically to tell them what happened shortly after the exam. Id., at 173-174.
[21] Accord the result of Bouterie v. Crane, supra. Therein, while it was not specifically addressed, a similar result was reached. When the judgment sustaining the exception of prescription was reversed, Bouterie was allowed to pursue her claim for damages for the entire 2 year period that she allegedly was sexually abused by Crane.
[22] See note 12, supra.