960 So.2d 336 (2007)
Ann EDWARDS, Individually and on behalf of her Son, Robert Edwards, Decedent, Plaintiff-Appellant.
v.
Dr. William C. ALEXANDER, Dr. James M. Belue, and Dr. Robert M. Raulerson, Defendants-Appellees.
No. 42,000-CA.
Court of Appeal of Louisiana, Second Circuit.
June 6, 2007.
*338 Delbert Gene Talley, for Appellant, Ann Edwards, Individually and on Behalf of Her Son Robert Edwards, Decedent.
Mayer, Smith & Roberts, L.L.P. by David F. Butterfield, for Appellee Dr. William C. Alexander.
Hayes, Harkey, Smith & Cascio by Bruce McKamy Mintz, for Appellee Dr. James Michael Belue.
Pettiette, Armand, Dunkelman, Woodley, Byrd & Cromwell, L.L.P. by Lawrence Wayne Pettiette, Jr., Joseph S. Woodley, for Appellee Louisiana Patients' Compensation Fund.
Before STEWART, GASKINS and DREW, JJ.
DREW, J.
In this medical malpractice action, we affirm the judgment granting the peremptory exception of prescription and dismissing plaintiff's claims.

FACTS
At approximately 7:20 on the evening of March 1, 1999, Robert Edwards presented to the emergency room ("ER") at Lincoln General Hospital. Edwards gave a history of diarrhea, vomiting for two days, increasing shortness of breath for two months, lethargy, and having passed out for a few seconds that day. His blood pressure was low and a pulse reading showed that he had tachycardia, or a rapid heart beat. He also had mild tachypnea, or rapid respirations. A pulse oximeter reading showed that he was slightly hypoxic, which meant he did not have a normal amount of oxygen in his blood. It was also recorded that Edwards had a fever. Edwards did not report having chest pain.
Edwards was examined by Dr. James Michael Belue, the double-coverage doctor in the ER that evening. His diagnosis was gastroenteritis. Dr. Belue prescribed Lortab and Motrin. Because Dr. Belue felt that Edwards's condition was stable, he *339 gave orders for Edwards to be discharged.[1] Dr. Belue's discharge instructions were to stop using marijuana, not to drink anything for six hours and then start with clear liquids, and to return to the ER if there were any further problems. Dr. Belue's shift ended at 10:45 p.m.
At 11:35 p.m., while Edwards was in the ER waiting room preparing to be discharged by the nurse, Edwards had what appeared to be a seizure. He was returned to an ER examination room, where he was treated by Dr. William Alexander, the primary ER doctor. An arterial blood gas test ("ABG") was ordered, and it showed that Edwards's levels of pO2 and pCO2 were abnormally low.[2] Dr. Alexander thought that Edwards had a hypoxic seizure, which he attributed to dehydration, so he ordered that Edwards receive IV fluids. Dr. Alexander agreed with Dr. Belue's earlier diagnosis of gastroenteritis and did not repeat the ABG. Edwards was discharged at approximately 2:10 a.m., and Dr. Alexander did not add anything to Dr. Belue's discharge instructions.
Dr. Alexander did not write any notes in the ER record, and the abnormal ABG results were not in the ER record when Edwards returned to the ER at approximately 3:40 p.m. on March 4. While Edwards was in the triage section, he had what the nurses thought was a seizure. Dr. Robert Raulerson, the ER doctor on duty, examined Edwards, who was sitting in a wheelchair and was not completely responsive. Dr. Raulerson observed Edwards have a tonic seizure that lasted approximately 20 seconds and during which Edwards had urinary incontinence, and which was followed by a very brief postictal state of confusion. Dr. Raulerson described the seizure he witnessed as being fairly subtle.
Edwards told Dr. Raulerson that he had been having "spells" during the last several days, and during these episodes he would lose consciousness and sometimes shake. Dr. Raulerson reviewed the ER records from Edwards's earlier visit, prescribed Valium, and diagnosed Edwards as having a possible new-onset seizure disorder.
Dr. Raulerson then referred the case to Dr. Belue, who became Edwards's attending physician.[3] Dr. Belue admitted Edwards to the ICU and ordered a CBC, urinalysis, drug screen, thyroid panel, and monitoring of his vital signs.[4] Dr. Belue asked Dr. Michael Ehrlich, a neurologist, to consult on the case, and he asked the ICU nurses to call him or Dr. Ehrlich if Edwards exhibited any seizure activity.
Despite being hospitalized, Edwards died on the afternoon of March 5 of a saddle pulmonary embolus, which was described as a blood clot that breaks free and occludes the pulmonary artery.
Legal Proceedings
On February 18, 2000, Mrs. Edwards filed a petition for a medical review panel against Drs. Belue and Raulerson. She amended her petition on June 20, 2000, to add Dr. Ehrlich as a defendant. On September 26, 2001, Mrs. Edwards amended her petition to add Dr. Alexander as a defendant.
*340 The panel ruled that the evidence did not support the conclusion that Dr. Belue, Dr. Ehrlich, or Dr. Raulerson failed to meet the applicable standard of care. The panel determined that the evidence supported the conclusion that Dr. Alexander failed to meet the applicable standard of care.[5] However, the panel also found that this breach by Dr. Alexander was not a factor in Edwards's damages and did not affect the ultimate outcome of his case.
On July 19, 2002, Ann Edwards ("Mrs. Edwards"), individually and on behalf of her son, filed a suit for wrongful death against Drs. William Alexander, James Belue, and Robert Raulerson.[6] On April 12, 2005, Dr. Alexander amended his answer to set forth a defense of prescription.
Following a trial on the merits, the jury returned a verdict finding that Dr. Alexander was negligent in his diagnosis and treatment of Edwards, and that the negligence caused or contributed to his death. The jury assigned 70% of fault to Dr. Alexander and 30% of fault to Edwards. Damages of $262,500 were awarded, subject to a 30% reduction. Dr. Belue was not found negligent in his diagnosis and treatment of Edwards. Costs were allocated along the same ratio as the finding of fault. Following the verdict, Dr. Alexander urged the exception of prescription. The Patients' Compensation Fund ("PCF") also urged the exception after intervening in the suit.
On November 15, 2005, the trial court sustained the exception of prescription. The trial court noted in its ruling that Mrs. Edwards was placed on notice of Dr. Alexander's possible involvement from Dr. Alexander's name appearing approximately six times on documents provided during discovery. Thus, Mrs. Edwards had in her possession information from which further inquiry should have been made.
On February 27, 2006, the court entered a judgment in accordance with the jury's verdict. However, in a judgment rendered on March 9, 2006, the court ruled that the February judgment was superseded by the court's granting of the exception of prescription. Accordingly, all claims were dismissed against Drs. Alexander and Belue, with costs assessed against Mrs. Edwards.
Mrs. Edwards appealed, arguing that: (i) the jury erred in not finding Dr. Belue liable; (ii) the trial court judge erred in granting the exception of prescription; (iii) the jury erred in allocating 30% of fault to Edwards; (iv) the trial judge erred in allowing Dr. Raulerson to testify as an expert; (v) the trial judge erred in taxing 30% of costs to Mrs. Edwards in the February 2006 judgment; and (vi) the damages award was abusively low. Dr. Alexander has answered the appeal seeking a reduction in damages and the amount of fault allocated to him.

DISCUSSION
I. Negligence of Dr. Belue
It has been alleged by Mrs. Edwards that Dr. Belue was negligent during the March 1 ER visit as well as during the March 4-5 ER visit and admission to the ICU. In a medical malpractice action, the plaintiff has the burden of proving the applicable standard of care, the breach of the standard of care, and the causal connection between the breach and the resulting *341 injuries. La. R.S. 9:2794(A); Robertson v. West Carroll Ambulance Service District, 39,331 (La.App.2d Cir.1/26/05), 892 So.2d 772, writ denied, XXXX-XXXX (La.4/22/05), 899 So.2d 577.
Visit to Emergency Room on March 1
Dr. David Schreck, who testified by deposition on behalf of Mrs. Edwards, is board-certified in emergency medicine and internal medicine. Dr. Schreck conceded that Edwards possibly had concomitant gastroenteritis when he presented to the ER on March 1.
Dr. Schreck opined that Dr. Belue breached the standard of care when he failed to diagnose the pulmonary embolism on March 1, perform a more thorough workup by ordering tests to confirm or exclude it, or at the very least when he failed to admit Edwards into the hospital. Dr. Schreck thought that Dr. Belue should have admitted Edwards because he was an obese smoker who had vascular instability, an abnormal chest X-ray, an abnormal EKG, complaints of shortness of breath, history of syncope, and was hypoxic.[7] It was noted by Dr. Schreck that obesity and smoking are risk factors for a pulmonary embolus. Dr. Schreck felt that Dr. Belue would have met the standard of care on March 1 by ordering an ABG test and a spiral CT or a VQ scan.
Dr. Frederick Carlton testified on behalf of Dr. Belue as an expert in emergency medicine. It was Dr. Carlton's opinion that Dr. Belue met the standard of care of an emergency physician. Diarrhea, nausea, and vomiting are not symptoms that Dr. Carlton would associate with a pulmonary embolus. Those three symptoms, along with fever, were consistent with Dr. Belue's diagnosis of gastroenteritis. Dr. Carlton noted that morbid obesity was the only risk factor for pulmonary embolus that Edwards exhibited.
Dr. Donald Givler, a member of the panel, testified as an expert in family medicine. Dr. Givler opined that Dr. Belue's diagnosis of gastroenteritis was supported by the medical chart, and he felt that there was no evidence that Edwards was unstable when Dr. Belue discharged him. Dr. Givler opined that none of Edwards's vital signs or Dr. Belue's findings, taken alone or in combination, showed a level of instability preventing a discharge.
Dr. Belue is a board-certified family practice physician. Dr. Belue tested Edwards's orthostatic blood pressure, and ordered an EKG, chest X-ray, CBC, chemistry profile, and drug screen. The chest X-ray was ordered by Dr. Belue because he was concerned about Edwards's complaints of having shortness of breath for two months.
Dr. Belue noted that tachycardia could cause shortness of breath, but he regarded tachycardia as a nonspecific finding. Dr. Belue did not consider pulmonary embolism in his differential diagnosis because shortness of breath associated with that condition is usually acute in onset. Instead, he considered another pulmonary condition, sarcoidosis, although he gave it a very low chance of occurring. Dr. Belue explained that sarcoidosis can cause chronic shortness of breath.
The chest X-ray was interpreted by Dr. Belue as showing some prominence in the hilum bilaterally without definite evidence of sarcoidosis, although he kept that condition in the differential diagnosis.[8] Dr. Belue found that the chest X-ray was nonspecific. The radiologist, Dr. Robert Francis, wrote in his report on March 2, *342 "Prominent hilar structures bilaterally which appear all vascular." Dr. Francis's impression was cardiac enlargement and prominence of the central pulmonary vessels.
Dr. Schreck found it significant that the chest X-ray showed prominence in the hilum bilaterally. He also thought it was significant that Dr. Belue wrote that there was no definite evidence of sarcoidosis, which is a disease of the lymph nodes and not the blood vessels. Dr. Schreck noted that prominence of central pulmonary vessels, the impression of the radiologist, is a finding associated with pulmonary embolism. However, the radiologist's report was not available to Dr. Belue when he left the ER on March 1.
It was admitted by Dr. Schreck that Edwards's weight could have contributed to his shortness of breath. Dr. Schreck believed that the shortness of breath complaint should have been addressed in Dr. Belue's ER report.
Dr. Carlton pointed out that although shortness of breath is generally a concern, shortness of breath for two months is not a complaint normally associated with a pulmonary embolus, as that is an acute event. Thus, Dr. Belue would have looked for a chronic pulmonary disease, such as sarcoidosis, to explain the shortness of breath. When asked if it was possible that Edwards had a recurrent pulmonary embolism condition in which he had a pulmonary embolus, it resolved over a month, then he had another pulmonary embolus, Dr. Carlton responded that that was unlikely.
Dr. Carlton testified that a person as overweight as Edwards sometimes has restrictive lung disease, which could cause chronic shortness of breath. Dr. Carlton added that he was comfortable in saying that anyone 100 pounds overweight almost certainly has an element of restrictive lung disease not apparent on X-ray. This condition prevents the lungs from fully expanding because they are inhibited by the chest wall. Dr. Givler thought that the shortness of breath could have been related to Edwards's weight.
Dr. Carlton noted from the chest X-ray report that the X-ray was abnormal, but thought it was a nonspecific read. Dr. Carlton also noted from this report that the heart was enlarged and the central pulmonary vessels were prominent, but he thought it was hard to know what to make of it without comparing it with prior X-rays. Nevertheless, Dr. Carlton felt there was nothing from the report which would have suggested that Edwards had a pulmonary embolus. Dr. Carlton also noted that elevated right side pressure from morbid obesity could have caused some of the X-ray findings.
The EKG was ordered by Dr. Belue because he wanted to confirm that Edwards had sinus tachycardia, which he thought was most likely caused by Edwards's obesity and fever. The EKG showed T-wave abnormalities, which Dr. Belue regarded as a nonspecific finding. Cardiologist Dr. William Smith read the EKG as showing sinus tachycardia and T-wave inversion, but could not exclude ischemia. Dr. Smith's report was not ready until March 2, so Dr. Belue obviously did not have it when he treated Edwards on March 1.
Dr. Schreck thought this EKG was markedly abnormal and should have led a doctor to consider the diagnosis of pulmonary embolism for an obese smoker who was short of breath and complained of passing out. He contended that these EKG results were alone enough to admit Edwards into the hospital. Dr. Schreck recognized a S1X3T3 pattern on the cardiogram that is consistent with pulmonary *343 embolism patients, although it is not specific for pulmonary embolism. In his EKG report, Dr. Smith did not mention the pattern observed by Dr. Schreck. Dr. Givler disagreed that Edwards's T-wave abnormalities were suggestive of a pulmonary embolism.
Although Dr. Carlton recognized that the EKG showed abnormalities, he considered these to be nonspecific T-wave changes, and without looking at a prior EKG to use as a baseline, he felt that Dr. Belue would not have known if that was normal for Edwards. Dr. Carlton stated that an ER doctor would not be required to admit an ER patient with that EKG reading without cardiac complaints. Dr. Carlton regarded an EKG as a very poor diagnostic tool for a pulmonary embolus.
The vital signs by Edwards on March 1 were not alarming to Dr. Belue, who did not consider the orthostatic blood pressure testing to be clinically significant. Dr. Belue did not think the oxygen saturation of 93% on the pulse oximeter was so abnormally low as to require admission as he did not consider this level to be significant in the context of Edwards's case.
Dr. Schreck found it significant that Edwards had reported passing out, although that could have been caused by dehydration. Dr. Schreck also thought the tachycardia was a significant finding by Dr. Belue.
Dr. Givler explained that Edwards's low blood pressure and elevated pulse during the first ER visit, as well as his reported passing out at home, could have been caused by dehydration related to the gastroenteritis. Dr. Givler felt that Edwards's low pulse oximeter reading could have been caused by the shortness of breath, and his fever could have been caused by the gastroenteritis.
Regarding the vital signs when Edwards was treated by Dr. Belue on March 1, Dr. Carlton found the blood pressure to be a little low, which could have been connected to dehydration. Dr. Carlton stated that the tachycardia is a nonspecific finding that is commonly caused by dehydration. Dr. Carlton noted that fever could raise the pulse and respiratory rates. Dr. Carlton also stated that the pulse rate is a better indication of dehydration than blood pressure is. Dr. Carlton thought that the orthostatic vital signs were indeterminate.
Dr. Carlton did not find the pulse oximeter reading of 93% to be terribly alarming for someone who presented with Edwards's history. He would have been more concerned with that reading if Edwards had a sudden onset of shortness of breath. Dr. Carlton testified that if the primary issue had been the pulmonary complaint, not syncope and digestive problems, then he would have preferred that Dr. Belue repeat the pulse oxygen test before discharging the patient. Dr. Carlton agreed that the 93% reading could not be attributed to the gastroenteritis, but he thought that it could have been a normal reading for Edwards considering his weight.
The chemistry profile ordered by Dr. Belue showed a marginally low carbon dioxide level, which could have been caused by the diarrhea, and which Dr. Belue felt was insignificant based upon Edwards's clinical presentation. The CBC showed high levels of hemoglobin and hematocrit. Dr. Belue thought these possibly suggested dehydration, although he did not think Edwards was so dehydrated that he needed to administer fluids or that it would be dangerous to discharge him. If Edwards had been severely dehydrated, Dr. Belue would have ordered IV fluids.
Dr. Schreck opined that Edwards's abnormal hemoglobin level on March 1 was *344 significant because it is a response to chronic hypoxia, although he recognized that high hemoglobin levels are sometimes seen in obese patients.
Dr. Carlton explained that the elevated hemoglobin and hematocrit levels could have been caused by dehydration, as well as by stress polycythemia. Dr. Carlton added that a slightly elevated hemoglobin level could be a sign of moderate dehydration. Although the blood chemistry profile showed that the carbon dioxide level was slightly low, Dr. Carlton thought this was caused by the diarrhea, and the body can compensate for this by speeding up the breathing rate.
In light of the history given by Edwards in the emergency room on March 1, Dr. Carlton could not find anything in the results of the tests ordered by Dr. Belue that should have suggested to Dr. Belue that Edwards had a pulmonary embolus or that he should do a more thorough workup. Even in hindsight, Dr. Carlton could not think of anything in the lab results that would make him suspect a pulmonary embolus. Dr. Carlton believed that based upon the complaints and test results, Edwards was stable when Dr. Belue discharged him, and the diagnosis of gastroenteritis was proper.
Visit to Emergency Room on March 4 and Subsequent ICU Admission
Dr. Belue admitted Edwards to the ICU because he thought it would be important to monitor Edwards in that setting in light of his lack of seizure history. He then consulted with Dr. Ehrlich, a neurologist. The nursing records from March 4 reflect that the ICU nurses reported seizure activity lasting approximately 15 seconds at 6:35 p.m., 8:30 p.m., and 9:00 p.m.[9] Two more seizures, one of which was a petit mal seizure, were reported between midnight and 1:00 a.m. These seizures occurred despite Edwards receiving Dilantin.
Dr. Belue did not see the ABG report on March 4 when checking the earlier ER record. The ABG report was not noted anywhere in the record on March 4, and he did not learn about it until he was sued. Nevertheless, even if the ABG results had been available on March 4, Dr. Belue would not have changed his diagnosis because Dr. Raulerson had witnessed a seizure with a brief post-ictal state, which is commonly seen in seizures with a neurological basis. Dr. Belue did not consider a pulmonary condition on March 4 because Edwards had presented with a seizure, not with any symptoms that made Dr. Belue think of a pulmonary condition. In fact, Dr. Raulerson did not recall Edwards complaining of shortness of breath when he presented at the ER. There was no complaint of chest pain.
At no time did Dr. Raulerson consider the possibility that Edwards had a pulmonary embolus. Dr. Raulerson thought that his problems were most likely neurological. Dr. Raulerson stated that although some of Edwards's symptoms could have been explained by a pulmonary embolus, they could have also been explained by many other conditions as well, which is why pulmonary embolism is a difficult diagnosis to make.
Dr. Ehrlich, who examined Edwards at 9:10 p.m. on March 4, marked in the progress notes that a brain CT scan and an EEG were normal. Dr. Belue consulted with Dr. Ehrlich on the morning of March 5. Dr. Belue noted that Edwards had mild cardiomegaly, or an enlarged heart, which was shown on the radiologist report from *345 the March 1 chest X-ray. On March 5, Belue was exhibiting high diastolic BP and he still had tachycardia. A brain MRI on March 5 was normal.
Dr. Belue noted that the gastroenteritis had resolved. After talking with Edwards, his impression was that Edwards was not post-ictal after his spells, which puzzled Dr. Belue because it is unusual for a neurological seizure not to be followed by a post-ictal state. Because of the normal brain CT scan and Dr. Ehrlich not having found anything in his evaluation, Dr. Belue began to suspect that Edwards's presenting condition was not neurologically based.
According to Dr. Belue, Dr. Ehrlich was not finished with his consult when they spoke on the morning of March 5, as Dr. Ehrlich ordered a video EEG monitor on March 5. It was a complete shock to Dr. Belue that Edwards had a pulmonary embolus, and he never suspected one until after the code was called.
Dr. Schreck opined that Dr. Belue breached the standard of care when he failed to diagnose the pulmonary embolism after Edwards returned to the hospital. It was his position that the information that Dr. Belue had retained from Edwards's earlier treatment, coupled with the vital signs and symptoms presented on March 4, should have suggested to Dr. Belue that Edwards had a pulmonary embolus.[10] Dr. Schreck added that Dr. Belue should have ordered a spiral CT or a VQ scan as part of the admitting workup to determine whether that condition was present.
Dr. Belue explained that history is the most important part of a pulmonary embolus diagnosis. He also stated that the VQ scan is not readily available on an emergency basis. Dr. Carlton did not think that the VQ scan is useful because it gives many false positives. In his opinion, the spiral CT of the chest is more worthwhile.
Regarding whether or not Edwards suffered true seizures, Dr. Schreck offered that Edwards could have been passing out and having muscle jerks that observers confused as seizures. Dr. Schreck also noted that Dr. Belue referred to the episodes as "spells" in his report, which indicated to Dr. Schreck that Dr. Belue was not convinced that Edwards actually had seizures.
Dr. Schreck believed that regardless of whether Edwards had true seizures or actually had syncopal episodes that observers confused as seizures, these incidents were symptoms of a pulmonary embolus and Dr. Belue needed to determine their relation to the other symptoms presented. Dr. Schreck referred to a progress note from Dr. Ehrlich on March 4 stating that there had not been a post-ictal state, and a progress note from Dr. Ehrlich on March 5 stating that despite therapeutic drug levels, Edwards had two seizures that were different from the others. Dr. Schreck felt that this should have prompted Dr. Belue to search for a non-neurological cause of the seizures.
Dr. Schreck conceded that it was reasonable for Dr. Belue to consult with Dr. Ehrlich. However, he pointed to Dr. Ehrlich's note on March 4 that a preliminary EEG report was normal and no epileptiform activity had been seen. Dr. Schreck felt that once Dr. Ehrlich could not find a neurological basis for the seizures, then Dr. Belue should have looked to a cardiopulmonary condition as the cause.
Dr. Carlton explained that syncope, or fainting, may be a symptom of a pulmonary embolus, but usually that occurs with a large pulmonary embolus. He was unsure why Edwards had so many episodes *346 of syncope. Dr. Carlton's theory was that an underlying lung disease may have made his lungs more susceptible to smaller emboli before the saddle embolus occurred.
Dr. Carlton thought it was appropriate for Dr. Belue to consult with a neurologist because an episode that appears to be a seizure is not a common symptom presented by someone with a pulmonary embolus. Dr. Carlton would not have suspected a pulmonary embolus after witnessing Edwards's spells. Subject to the caveat that he is not a family practitioner, Dr. Carlton felt that based upon the complaints that brought Edwards back to the hospital, Dr. Belue met the standard of care for his treatment of Edwards between March 4 and March 5.
Dr. Givler believed that nothing from Edwards's second presentation at the ER suggested that he had anything but a neurological disorder, so it was not necessary for Dr. Belue to seek a consultation with a doctor other than a neurologist. Although shortness of breath is a symptom of a pulmonary embolism, Dr. Givler would not have considered it a symptom in Edwards's case because he had complained that the shortness of breath had existed for a couple of months. In Dr. Givler's opinion, Edwards did not have any symptoms that should have made Dr. Belue think there was a possible pulmonary embolism. In sum, Dr. Givler would not have expected Dr. Belue to suspect a pulmonary embolism based upon the history, test results, and physical findings presented both times that he treated Edwards.
Jury's Determination that Dr. Belue Was Not Negligent
An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong, and where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Cole v. Department of Public Safety & Corrections, 2001-2123 (La.9/4/02), 825 So.2d 1134; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Cole, supra; Rosell v. ESCO, 549 So.2d 840 (La. 1989). To reverse a fact finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart, supra.
Based upon our review of the hospital reports, test results, and the extensive and detailed medical testimony, we cannot conclude that the jury was clearly wrong in not finding that Dr. Belue was negligent in his diagnosis and treatment of Edwards.
II. Prescription
Mrs. Edwards contends that it was not until Dr. Belue filed his position paper with the medical review panel in August of 2001 that she realized that Dr. Alexander had been involved in her son's treatment. Included with this position paper was Dr. Belue's time sheet showing that he checked out of the ER at 10:45 p.m. on March 1. The request for a medical review panel was amended on September 26, 2001 to add Dr. Alexander as a defendant.
The period allowed for bringing a medical malpractice claim is set forth in La. R.S. 9:5628(A):
No action for damages for injury or death against any physician . . . arising out of patient care shall be brought unless *347 filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
Mrs. Edwards's amended claim against Dr. Alexander would have been timely if the jury had found that Dr. Belue was negligent, as that would have meant that he was a solidary obligor with Dr. Alexander. La. R.S. 40:1299.47(A)(2)(a) states, in part:
The filing of a request for review of a claim shall suspend the running of prescription against all joint and solidary obligors, and all joint tortfeasors, including but not limited to health care providers, both qualified and not qualified, to the same extent that prescription is suspended against the party or parties that are the subject of the request for review.
Once the jury found that Dr. Belue was not negligent, he was no longer an alleged solidary obligor or joint tortfeasor with Dr. Alexander. The other original defendant, Dr. Raulerson, had been earlier dismissed with prejudice upon Mrs. Edwards's motion. Therefore, the timely filing of a request for review of the claims against Drs. Belue and Raulerson did not suspend the running of prescription on the untimely-filed claim against Dr. Alexander.
Prescriptive statutes are to be strictly construed against prescription and in favor of the obligation sought to be extinguished. Bustamento v. Tucker, 607 So.2d 532 (La.1992). The party raising the exception of prescription ordinarily bears the burden of proof at the trial of the peremptory exception. Spott v. Otis Elevator Co., 601 So.2d 1355 (La.1992). However, when the plaintiff's petition reveals on its face that prescription has run, the plaintiff bears the burden of showing why the claim has not prescribed. Lima v. Schmidt, 595 So.2d 624 (La.1992).
It was not until September 26, 2001, that Mrs. Edwards amended her petition for a medical review panel to add her claim against Dr. Alexander. Because this was more than one year after the date of the alleged malpractice by Dr. Alexander, the petition on its face is prescribed. In her amended petition, Mrs. Edwards did not allege facts asserting that she was unaware of Dr. Alexander's malpractice during the prescriptive period. Mrs. Edwards had the burden of proving a suspension of prescription as to her claim against Dr. Alexander.
Contra non valentem
In order to soften the occasional harshness of prescriptive statutes, our courts have recognized a jurisprudential exception to prescription: contra non valentem agere nulla currit praescriptio, which means that prescription does not run against a person who could not bring his suit. Harvey v. Dixie Graphics, Inc., 593 So.2d 351 (La.1992). Contra non valentem in medical malpractice suits is embodied in La. R.S. 9:5628. White v. West Carroll Hospital, Inc., 613 So.2d 150 (La. 1992).
The doctrine of contra non valentem acts as an exception to the general rules of prescription by suspending the running of prescription when the circumstances of the case fall into one of four categories. Mrs. Edwards asserts that the third and fourth categories of contra non valentem apply. Under the third category, prescription is suspended when "the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action." Wimberly *348 v. Gatch, 93-2361 (La.4/11/94), 635 So.2d 206, 211. In order to trigger application of the third category, a doctor's conduct must rise to the level of concealment, misrepresentation, fraud or ill practices. Fontenot v. ABC Ins. Co., 95-1707 (La.6/7/96), 674 So.2d 960. There is no indication that Dr. Alexander took any action that effectually prevented Mrs. Edwards from availing herself of his involvement in her cause of action. Neglecting to write anything on the ER chart does not rise to the level of concealment.
Prescription is suspended under the fourth category of contra non valentem when "some cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant." Wimberly v. Gatch, 635 So.2d at 211. For the fourth category to apply, the plaintiff's ignorance of his cause of action cannot be attributable to his own willfulness or neglect, as a plaintiff is deemed to know what he could have learned by reasonable diligence. Renfroe v. State ex rel. Dept. of Transp. and Development, 01-1646 (La.2/26/02), 809 So.2d 947.
Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry. Campo v. Correa, 2001-2707 (La.6/21/02), 828 So.2d 502. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. Id.
Dr. Alexander's name appears numerous times in the medical records from the first ER visit:
 The "Emergency Room Sheet" has Dr. Alexander's name typed in the blank for admitting physician, although Dr. Alexander's name is scratched out and Dr. Belue's name is handwritten in its place.
 The "Emergency Room Care Sheet" has Dr. Alexander's name typed in the blank for ER physician.
 The Outpatient Instructions page has Dr. Alexander's name typed under Edwards's name.
 "Referred by: DR. ALEXANDER" is printed on the EKG chart.
 The Condition of Admission page has Dr. Alexander's name typed under Edwards's name.
 The radiologist's report for the chest X-ray lists Dr. Alexander as the requesting physician.
 The confirmation of the marijuana positive from an outside lab has Dr. Alexander's name typed in for doctor, although Dr. Belue's name is handwritten at the top of the page.
It was explained at trial that Dr. Alexander's name was probably typed on the ER sheet as admitting physician and on the ER care sheet as ER physician because he was the primary ER doctor at the hospital when Edwards first presented there. For the March 4 ER visit, Dr. Raulerson's name was listed as the admitting physician and ER physician on these two sheets. Dr. Belue testified that protocol was the reason that Dr. Alexander's name was listed on several other documents. Nevertheless, the reports from the blood chemistry test, blood culture, CBC, and drug screen all list Dr. Belue as the admitting physician. The ABG results page has a blank next to "Physician Name."
If the mention of Dr. Alexander's name on numerous documents in the ER record did not excite plaintiff's curiosity about the involvement of Dr. Alexander in her son's treatment, then certainly questions had to be raised when Dr. Belue's dictated ER report from March 1 was read by plaintiff. Nowhere does this report mention either the seizure at 11:40 or the ABG results *349 among the test results listed under laboratory data, even though the seizure was documented on the ER care sheet and the box next to the ABG was checked and circled on the ER care sheet.[11]
In the "Significant Findings and Treatment" section of the report that he dictated on April 27, 1999, Dr. Belue mentioned what happened in the ER after he left. This section stated:
This is a 28-year-old black male student at GSU who presented to the ER on 3/1/99 and was treated for gastroenteritis with fever. Following that discharge he had some type of episode while he was still in the ER and subsequently received some IV fluids and then released. He related the next few days he was scared to go anywhere because he would lose consciousness and shake all over. He presented back to the ER for evaluation. While he was there, he had a witnessed seizure with urinary incontinence. He had no previous history of seizure disorder or any other significant problems. He was admitted to the hospital for care with neurological evaluation.
While the above-quoted section does not mention Dr. Alexander, it also does not mention Dr. Raulerson's involvement on the second ER visit. Moreover, this report does not reference the ABG results. We note that while this report states what happened on March 1 following discharge, what occurred following discharge is not referenced in Dr. Belue's earlier dictated report from that actual ER visit.
Dr. Belue apparently did not know that Dr. Alexander was involved in the treatment of Edwards until after the malpractice claim was brought. Nevertheless, this does not excuse plaintiff from closely examining the medical records and satisfying her curiosity about why Dr. Alexander's name appears on so many of the records related to the first ER visit. In a reply to the position papers at the medical review panel level, Mrs. Edwards's counsel wrote that prior to Dr. Belue's submission, he assumed that Dr. Alexander's name was on the ER Care Sheet in error. Reasonable diligence would have prompted Mrs. Edwards to attempt to ascertain if Dr. Alexander had been involved in her son's treatment on March 1.
Compare Shortess v. Touro Infirmary, 520 So.2d 389 (La.1988), where the medical records did not reveal that the plaintiff's tainted blood came from anywhere other than Touro's blood bank, and the plaintiff had no way of knowing that an outside blood bank was the source of her tainted blood as that could only be discovered by tracing serial numbers through Touro's card files.
In this matter, the trial court granted the exception of prescription after the trial on the merits was completed.[12] When evidence is introduced at the hearing on the peremptory exception of prescription, the district court's findings of fact are reviewed under the manifest error-clearly wrong standard of review. Carter v. Haygood, XXXX-XXXX (La.1/19/05), 892 So.2d 1261. Based upon this record, we cannot conclude that the trial judge *350 was clearly wrong in granting the exception of prescription.
La. C.C.P. art. 1153
Mrs. Edwards further argues that the amended claim is timely because of the provisions of La. C.C.P. art. 1153, which states:
When the action or defense asserted in the amended petition or answer arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of filing the original pleading.
La. C.C.P. art. 1153 is an attempt to strike a balance between a plaintiff's right to proceed against the correct defendant and the defendant's right to be free from stale and prescribed claims. Fortenberry v. Glock, Inc. (USA), 32,020 (La.App.2d Cir.6/16/99), 741 So.2d 863.
The doctrine of relation back of amended pleadings should be liberally applied, particularly in the absence of prejudice. Strouse v. M & M Properties, 32,792 (La.App.2d Cir.3/3/00), 753 So.2d 434.
In Ray v. Alexandria Mall, 434 So.2d 1083 (La.1983), the supreme court established four criteria to be used in determining whether an amendment changing the identity of the party sued relates back to the date of filing of the original petition:
(1) The amended claim must arise out of the same transaction or occurrence set forth in the original pleading.
(2) The purported substitute defendant must have received notice of the institution of the action such that he will not be prejudiced in maintaining a defense on the merits.
(3) The purported substitute defendant must know or should have known that but for a mistake concerning the identity of the proper party defendant, the action would have been brought against him.
(4) The purported substitute defendant must not be a wholly new or unrelated defendant, since this would be tantamount to assertion of a new cause of action which would have otherwise prescribed.
The amended complaint in this case does not relate back because Dr. Alexander was a wholly new and unrelated defendant. His only connection to Dr. Belue in this matter was that they both worked in the ER at Lincoln General Hospital, with Dr. Alexander being the Director of the ER. This is not a case where Mrs. Edwards has simply misnamed a defendant through a pleading mistake and wishes to substitute defendants. Compare Findley v. City of Baton Rouge, 570 So.2d 1168 (La.1990), where the plaintiff, intending to sue the owner of a public park, mistakenly sued the city of Baton Rouge instead of a separate legal entity, BREC, over which the city had an element of control. In allowing the amended petition to relate back, the supreme court likened the relationship between Baton Rouge and BREC to that of a parent corporation and a subsidiary.
Mrs. Edwards's amended petition does not relate back to the date on which the original petition for a medical review panel was filed. Accordingly, the amended claim was untimely, and her cause of action against Dr. Alexander has prescribed.

CONCLUSION
We find no error in the jury's conclusion that Dr. Belue was not negligent. We also do not find error in the trial court's dismissal of all claims against Dr. Alexander on the grounds of prescription. Accordingly, it is unnecessary for this court to review the remaining assignments of error *351 relating to allocation of fault, damages, and the taxing of costs.[13]

DECREE
At appellant's costs, the judgment dismissing her claims is AFFIRMED.
NOTES
[1] The nurses normally carry out the actual patient discharge.
[2] Dr. Alexander claims that the ABG was ordered by an ER nurse.
[3] The hospital had a rotating system of doctors being on-call for patients who did not have a primary care doctor, and Dr. Belue happened to be on-call at the time.
[4] Dr. Belue testified that it is typical to admit new-onset seizure cases to the ICU.
[5] Dr. Givler, a member of the panel, explained that the oxygen level was abnormal on the blood gas test, and the panel felt that Dr. Alexander did not address it to their satisfaction.
[6] Mrs. Edwards dismissed her claim against Dr. Raulerson on December 9, 2002.
[7] Edwards was hypoxic because his pulse oximeter reading was 93% on room air.
[8] Dr. Belue told Edwards to follow up on the possibility of sarcoidosis with his doctor.
[9] Dr. Belue checked on Edwards at 6:40 p.m. after being notified of the 6:35 seizure. Valium was prescribed. Dr. Ehrlich saw Edwards at 9:10 p.m., then called the next morning at 7:00.
[10] On March 4, Edwards still had tachycardia, and an EKG was abnormal.
[11] Dr. Raulerson explained the common procedure at the ER at the time was that the doctor would check off the tests he wanted performed, the secretary circled it when the test was ordered, and then the circle was blackened, usually by the secretary, when the results came back and were placed in the chart. In addition to the ABG, the boxes for the chest X-ray and urine screen were checked and circled but not blackened.
[12] Exhibits relevant to the exception were entered into evidence outside the presence of the jury.
[13] Mrs. Edwards further complained on appeal about Dr. Raulerson testifying as an expert when he was not qualified to do so. Her counsel did not object to this testimony, instead merely stating that Dr. Raulerson "is getting into expert testimony and he has not been qualified. I just want to mention that for the record." Because there was no objection, there was no ruling by the court. Moreover, the testimony at issue involved an insignificant urinalysis from March 4.