849 So.2d 762 (2003)
STATE FARM FIRE AND CASUALTY COMPANY as Subrogee to the Rights of HH & K Realty Louisiana Partnership
v.
M.L.T. CONSTRUCTION COMPANY, INC., Hibernia Roofing & Metal Work, Inc., a/k/a Hibernia Roofing and/or Hibernia Roofing & Siding, Hermitage Insurance Company, Charles Iglesias, and Iglesias & Associates.
Tracy J. Bouma and Ty G. Bouma, Individually and on Behalf of their Minor Children, Adam L. Bouma, Zachary R. Bouma, And Eva L. Bouma
v.
H.H. & K. Realty, A Louisiana Partnership, M.L.T. Construction Company, Hibernia Roofing & Metal Work, Inc., Charles Iglesias, Iglesias and Associates, Hermitage Insurance Company, ABC Insurance Company and DEF Insurance Company.
Nos. 2002-CA-1811, 2002-CA-1812.
Court of Appeal of Louisiana, Fourth Circuit.
June 4, 2003.
*764 Rockne L. Moseley, Moseley & Associates PLC, New Orleans, LA, for Plaintiff/Appellee.
*765 James Ryan, III, J. Michael Monsour Sessions, Fishman & Nathan, LLP, New Orleans, LA, for Defendant/Appellant.
(Court Composed of Judge Charles R. Jones, Judge James F. McKay III, Judge and Max N. Tobias, Jr.).
MAX N. TOBIAS, JR., Judge.
This appeal involves a suit filed by Tracy Bouma and her husband, Ty Bouma, stemming from personal injuries suffered by Ms. Bouma, consisting of an aggravated allergic reaction to mold, mildew, and other allergens allegedly introduced into her work environment by an influx of water at the HH & K building, where Ms. Bouma was working and employed as a legal secretary.
FACTUAL BACKGROUND[1]
Tracy Bouma began her job as a legal secretary for the law firm of Herman, Herman, Katz & Cotlar ("the Herman firm") on or about 27 March 1996 and left its employ on or about 1 April 1997. Prior to and during her employment by the Herman firm, the office of the Herman firm was located in the HH & K building at 820 O'Keefe Avenue in New Orleans. Prior to the commencement of her employment, the HH & K building had sustained water intrusion as a result of its leaking roof.
Less than two months after Ms. Bouma was employed by the Herman firm, HH & K Realty, A Louisiana Partnership ("HH & K Realty"), the owner of the HH & K building, retained MLT Construction Company, Inc. ("MLT Construction") d/b/a Hibernia Roofing ("Hibernia")[2] to re-roof the building. Charles J. Iglesias and his architectural firm, Iglesias & Associates, An Architectural Corporation ("Iglesias & Associates"), were retained to design the new roof and subsequently acted as an intermediary between HH & K Realty and the roofing company.
Hibernia began working on the roofing project on 21 May 1996 and completed the roofing job on or about 18 June 1996. During the re-roofing process, rainwater entered the HH & K building during heavy rainstorms, causing damage to the building's interior, ceiling tile, wallboard, wall coverings, and carpet. Diane Share, the office administrator for the Herman firm, recounted the flooding events in a memorandum prepared on or about 18 July 1996:
On Sunday June 2, 1996, we had the first very significant rain storm which caused extensive damage inside the building. The rain poured down the walls in the library in such volume as three staff members mopped for 4 hours straight. The water was still coming down with over½ inch of water on the floor in those areas after 4 hours. Additional staff people were called to help wipe up these areas. Three people went on the roof and used brooms to push the water off the roof. On this roof above the library, there was 3 inches of standing water fueling the leak below.
On Monday June 3, 1996, Munters (a dehumidifying and cleaning company) was called to assist in the clean up and set up of dehumidifiers and fans to get the moisture from the building. A carpenter was sent by our contractor, Mr. Velez, to remove the mirrored panels *766 covering the sheet rock that was soaking wet. Later a cleaning crew was called in to try to disinfect the area and to try to kill mildew and mold growing on the sheet rock and surfaces in the hall and library. Wallpaper bubbled from trapped water and became stained and soiled. Ceiling tiles were heavily damaged, as well as carpeting in some areas of the building.
A meeting was held June 3, 1996 with Charles Iglesias, our architect, and Cynthia Salerno of Hibernia Roofing regarding the water in the building and how to prevent additional leaks. Discussion was held regarding the use of sump pumps, the consideration of the use of a huge tarp and visqueen tarps to protect the furnishings and people below. We were assured this was the end of the leaking.
On June 13, 1996, the accounting area received rain water like a waterfall, particularly in the front corner. The back of the accounting area received water as well. On June 14, 1996, water was leaking into the office of Steve Lane in front of the building and, luckily, the Yankee memorabilia there was able to be moved from his office without damage. Water was pouring like a waterfall from the ceiling of the main hallway. All the furniture had to be moved to protect the items as much as possible. Munters delivered additional equipment to remove the humidity.
On June 17, 1996, the office of the administrator and the accounting area again got soaked. At first, it was thought the water was coming in from the air conditioners. After the roof construction crew left the premises, a crack in a vent cover was found by our architect which caused this problem. This crack was a result of faulty construction and was replaced by Hibernia.
After the roofing project was completed, the interior of the building underwent extensive renovations that continued for one year, until April 1997.
Ms. Bouma experienced a series of chronic colds, headaches, and respiratory problems following the 2 June 1996 water intrusion. Her symptoms escalated, and the plaintiff sought medical treatment from Rory J. Duffour, M.D., who prescribed medications to ease her respiratory complaints. She visited Dr. Duffour approximately five (5) times between June 1996 and April 1997. Ms. Bouma's medical records do not reflect that Dr. Duffour was of the opinion that Ms. Bouma's ailments were caused by her work environment. Ms. Bouma continued to suffer from respiratory difficulties while working at the Herman firm.
On 28 April 1997, Ms. Bouma was evaluated by Hans Schuller, M.D., a pulmonologist, who opined that her condition was related to the conditions at her workplace. He stated that she suffered from "some underlying asthmatic predisposition which is aggravated by the dusty and dirty work environment." Over the course of her treatment, Ms. Bouma was determined to be highly allergic to some types of mold spores and dust mites, and more mildly allergic to cat and dog dander. The record reflects that Ms. Bouma had suffered from pneumonia three times prior to her employment at the Herman firm and had a history of respiratory problems.
In April 1998, Ms. Bouma began seeing Andrew Rogness, M.D., a pulmonologist, who testified in his deposition that she suffers from asthma. According to Dr. Rogness, asthma was, in Ms. Bouma's case, a pre-existing condition. It can remain non-symptomatic in a patient until triggered by a significant exposure to an allergen, which is known as a "heralding event." The plaintiffs maintain that Ms. *767 Bouma's "heralding event" was exposure to mold at the Herman firm resulting from the influx of water during the roofing project at the HH & K building.
On 1 April 1998, Ms. Bouma and her family filed suit alleging personal injuries caused by her exposure to hazardous, poisonous, and injurious substances, which existed in and as a part of the HH & K building. The Herman firm, HH & K Realty, MLT Construction, Hibernia Roofing & Metal Work, Inc., Charles Iglesias, Iglesias & Associates, and Hermitage Insurance Company ("Hermitage"), which had issued a general liability policy insuring Hibernia, were all named as parties defendant. In particular, the Boumas alleged that Hibernia was negligent for exposing Ms. Bouma to contamination, ruin, vice, defects, dangerous conditions, and materials existing therein and brought in by the re-roofing work. State Farm & Casualty Company ("State Farm"), the insurer for the Herman firm who had subrogated to the rights of the firm by virtue of payment of the claim, filed suit against MLT Construction, Charles Iglesias, Iglesias & Associates, Hibernia, and Hermitage, seeking damages for property damage and other losses associated with the water damage to the HH & K building.[3]
On 18 August 2000, the Boumas dismissed with prejudice all claims made on behalf of their minor children, leaving only their claims for personal injury and loss of consortium. On 1 September 2000, the Boumas dismissed all claims filed against HH & K Realty, Charles Iglesias and Iglesias and Associates, leaving only their claims against Hibernia, Hermitage, and MLT Construction. All proceedings against Hibernia and MLT Construction were stayed because they were found to be insolvent by the bankruptcy courts.
The trial of this matter began on 18 December 2001 and proceeded as a bench trial. The trial court rendered judgment in favor of the plaintiffs and against Hermitage and awarded Tracy Bouma $25,000.00 in general damages and Ty Bouma $5,000.00 for loss of consortium. State Farm, as subrogee to the rights of HH & K Realty, was awarded $28,141.67 for its property damage claims against Hermitage. In its reasons for judgment, the trial court found that Hibernia was negligent in its handling of the roofing project and that its negligence had allowed "massive amounts" of rainwater to enter the building. The court noted that the plaintiffs never contested Hermitage's assertion that rainwater had entered the building before the roofing work began; however, the trial court found that the plaintiffs established by a preponderance of the evidence that the rainwater intrusions prior to the re-roofing work were minimal when compared to the rainwater intrusions that occurred during the roofing work performed by Hibernia.
With regard to Ms. Bouma's medical condition and its cause(s), the trial court found that the evidence preponderated to show that although Ms. Bouma testified that she had never been diagnosed with asthma prior to the roofing work, she did have asthma prior to the summer of 1996, but that the roofing project and the resulting influx of water exacerbated her disease.
Prior to the trial on the merits, Hermitage had filed and set for hearing an exception of prescription on the grounds that although Ms. Bouma claimed exposure to mold and contaminants introduced to the *768 HH & K building by the rainwater intrusions which ended after the roofing job concluded in June 1996, she and her husband did not file suit until 1 April 1998, almost two years later. The exception of prescription was overruled, and Hermitage filed an application for a writ of certiorari with this court on the denial of the exception; the writ was denied on the grounds that prior to April 1997, the plaintiff did not know what was causing her ailments. This court further found that the plaintiff did not act unreasonably or negligently with regard to determining the cause of her ailment or in seeking treatment for her ailment.
Finally, the trial court further found that rainwater is not a pollutant or contaminant and, as a result, the total pollution exclusion contained in the Hermitage policy does not apply to the plaintiffs' claims.
Hermitage appeals the trial court's judgment in favor of the plaintiffs, asserting three assignments of error. First, Hermitage asserts that the trial court erred in finding that the plaintiffs' damages were caused by Hermitage's insured's conduct or fault and further erred in failing to assign any degree of fault to other tortfeasors, as required by the comparative fault system that governs Louisiana tort law. Second, Hermitage argues that the trial court erred in ruling that the insurance policy issued by Hermitage provided coverage for the injuries sustained by the plaintiffs. Third, Hermitage asserts that the trial court erred in applying the legal doctrine of contra non valentem agere nulla currit praescripto to the facts of this matter and finding that the claims of the plaintiffs had not prescribed as a matter of law.
Hermitage's Assignment of Error Number One
As its first assignment of error, Hermitage asserts that the trial court erred in finding that any conduct of Hermitage's insured caused or was related to Ms. Bouma's alleged illness and further erred in failing to assign fault to all tortfeasors as required by Louisiana's comparative faultbased tort system. Hermitage further argues that the plaintiff was contributorily negligent in aggravating her asthma.
Hermitage asserts that the evidence presented at trial clearly showed that Ms. Bouma began suffering from respiratory problems before the roofing work began at the HH & K building. Further, Ms. Bouma testified that the ceiling above her desk was leaking before the roofing project began and that the ceiling tiles above her desk fell and ruined items on her desk before Hibernia began work on the roof. Diane Share, the office manager, testified at trial that on at least one occasion, workers from the office had to go on the roof to push water off the old section of the flat roof during a rainstorm because the interior of the office was taking in substantial amounts of water. She testified that the section of the roof that was leaking was not being worked on by Hibernia and had not been re-designed by Charles Iglesias. Co-workers of Ms. Bouma confirmed that prior to the roofing project, plastic pails and trash cans were used to collect water dripping or leaking from the ceiling. Hermitage argues that the evidence presented at trial established, at the very least, the fault of the HH & K building owners.
Hermitage further asserts that the maintenance crews working at the HH & K building during the renovation of the offices were negligent. Testimony at trial indicates that during the renovation project, carpets and other materials damaged by the leaking roof were allowed to remain in the office space and were not immediately discarded.
*769 With regard to Ms. Bouma herself, Hermitage maintains that she was negligent in failing to mitigate her damages, as she testified that she has smoked a few cigarettes during her illness due to stress associated with her father's health problems. Further, although Ms. Bouma was found to be allergic to cat and dog dander, Ms. Bouma testified that her family had dogs and cats that were kept outside of the house. Hermitage also points out that Ms. Bouma failed to tell Dr. Duffour about her work environment, and failed to put any thought into why she was sick, waiting "until the last minute" to see Dr. Duffour.
It is well-settled that a trial court's findings of fact will not be disturbed unless the record establishes that a factual, reasonable basis does not exist and the finding is clearly wrong or manifestly erroneous. Syrie v. Schilhab, 96-1027, p. 4 (La.5/20/97), 693 So.2d 1173, 1176. Thus, in order to reverse a trial court's findings of facts, an appellate court must first determine, after reviewing the record in its entirety, that a reasonable factual basis does not exist for the finding and that the record establishes that it is clearly wrong. Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987).
We find no manifest error with the trial court's finding that Ms. Bouma was not contributorily negligent. As discussed below with regard to the third assignment of error, we do not find that Ms. Bouma acted unreasonably or negligently in the investigation or treatment of her illness. We similarly do not find that the evidence in the record supports a finding that any negligence on her part actually caused her illness.
In the present case, although we might have evaluated the evidence such that a percentage of fault could be attributed to other tortfeasors in this matter, we find no manifest error on the part of the trial court in reaching the conclusion that Hermitage should be held liable for 100% of the damages proven at trial. The nature of Ms. Bouma's illness is such that it is difficult, if not impossible, to determine precisely its cause. As noted in the reasons for judgment, the trial court took into consideration the potential fault of the building owners and other potential tortfeasors, but concluded after reviewing the evidence that Hibernia's negligence had more likely than not caused the plaintiffs' damages, as the water intrusions into the building prior to the roofing job were found to be minor in comparison with the amount of damage caused by Hibernia's roofing work. Although, under the evidence presented at trial, it is conceivable that other parties might have been found liable for the Boumas' damages, we find no manifest error in the trial court's evaluation of the evidence before it and conclusions regarding allocation of fault.
Hermitage's Assignment of Error Number Two
Hermitage argues that the policy issued to MLT Construction d/b/a Hibernia Roofing did not provide coverage for the plaintiffs' injuries because the policy contained a total pollution exclusion endorsement. The endorsement in question provides that:
This insurance does not apply to:
f. (1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time. "Pollutant" means any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.
*770 This total pollution exclusion is identical to the pollution exclusion clause dealt with in Ducote v. Koch Pipeline Co., 98-0942 (La.1/20/99), 730 So.2d 432, which Hermitage cites as controlling authority with regard to interpretation of pollution exclusion clauses. However, the Louisiana Supreme Court has overruled the Ducote decision and the current law on interpretation of these clauses is set forth in Doerr v. Mobil Oil Corporation, XXXX-XXXX (La.12/19/00), 774 So.2d 119. In Doerr, the Supreme Court described the history of pollution exclusion clauses insurance policies and noted that the policy considerations underlying the inclusion of pollution exclusion clauses involved forcing environmental polluters to pay for damages caused by their polluting activities by removing those losses from coverage by their general liability insurance, and thereby discouraging polluting activity. Id.
The Doerr court observed that "the total pollution exclusion was neither designed nor intended to be read strictly to exclude coverage for all interactions with irritants or contaminants of any kind" and held that whether a pollution exclusion clause applies to a loss turns on the following factors: (1) whether the insured is a "polluter" within the meaning of the exclusion; (2) whether the injury-causing substance is a "pollutant" within the meaning of the exclusion; and (3) whether there was a "discharge, dispersal, seepage, migration, release or escape" of a pollutant by the insured within the meaning of the policy. Doerr, 774 So.2d at 135.
Whether an insured is a "polluter" is a factual issue that should "encompass consideration of a wide variety of factors." Id. at 136. Specifically, the Court noted that the trier of fact should take into consideration the type of business in which the insured is engaged and whether that business presents a risk of pollution; whether the disputed claims are covered by any other policy; whether the insured should have known from a reading of the policy that a separate policy covering pollution damages would be necessary for the business; who the insurer typically insures; any other claims made under the policy; and any other factor the trier of fact deems relevant to the inquiry. Id.
Whether a substance is a "pollutant" is similarly a fact-intensive question. As the Supreme Court noted in Doerr, there are a variety of substances that could fall within the broad definition of irritants and contaminants that are found in total pollution exclusion clauses as in the policy in question. The Doerr court held that a trier of fact should consider:
the nature of the injury-causing substance, its typical usage, the quantity of the discharge, whether the substance was being used for its intended purpose when the injury took place, whether the substance is one that would be viewed as a pollutant as the term is generally understood, and any other factor that the trier of fact deems relevant to that conclusion.
Id. at 135.
In the present matter, the complained-of pollutant was rainwater and, arguably, the mold and mildew that allegedly resulted from the influx of that rainwater. Using the factors enunciated by the Supreme Court, we note that rainwater is not a substance that is usually viewed as a pollutant. Further, although a roofing contractor may in the course of his business use many different chemicals and/or materials that could be considered pollutants, it was not the utilization or dispersal of dangerous materials by Hibernia that is alleged to have caused the plaintiffs' damages; rather, it was the failure to prevent rainwater from invading the office space of *771 the Herman firm that is alleged to be the proximate cause of the plaintiffs' damages.
Finally, determination of whether there was a "discharge, dispersal, seepage, migration, release or escape" is a factbased inquiry that takes into account all relevant circumstances. Specifically, the trier of fact should consider whether the pollutant was intentionally or negligently discharged, the amount of the injury-causing substance discharged, whether the actions of the alleged polluter were active or passive, and any other facts relevant to the inquiry.
Although Hermitage relies upon the broad reading of the pollution exclusion clause in Ducote, the Supreme Court has made it clear that the Ducote decision was a departure from a fairly consistent line of jurisprudence in Louisiana. Cases preceding Ducote established the premise that "pollution exclusions are intended to exclude coverage for active industrial polluters, when businesses knowingly emitted pollutants over extended periods of time." Thompson v. Temple, 580 So.2d 1133, 1134 (La.App. 4 Cir.1991). In West v. Board of Commissioners, 591 So.2d 1358 (La.App. 4 Cir.1991), this court refused to extend a pollution exclusion clause to deny coverage for injuries sustained by an investigator who was injured when he inhaled pesticide fumes that had leaked from damaged storage containers at his work, noting that a pollution exclusion clause is inapplicable when an insured only incidentally possesses a pollutant in the course of their business. As the plaintiffs note, the clear purposes of the pollution exclusion clauses are to prevent businesses from escaping responsibility for polluting behavior by procuring insurance to cover such losses and further to encourage businesses to curb polluting activities.
It is clear that the facts of this case are not appropriate to trigger the total pollution exclusion in the Hermitage policy and, as such, the Boumas' claims are not precluded from coverage under the general liability policy.
Hermitage's Assignment of Error Number Three
Hermitage finally asserts that the trial court erred in failing to find that the plaintiffs' claims were prescribed as of 1 April 1998, when the petition for damages was filed.
The prescriptive period for delictual actions is one year, which commences to run from the day injury or damage is sustained. La. C.C. art. 3492. The statutes governing prescription are strictly construed against prescription in favor of the obligation sought to be extinguished. Williams v. Lafayette Ins. Co., 98-2855 (La.App. 4 Cir. 5/19/99), 740 So.2d 183, 185. Ordinarily, the party pleading an exception of prescription bears the burden of proof. Niklaus v. Bellina, 96-2411 (La.App. 4 Cir. 5/21/97), 696 So.2d 120, 122. However, where the face of the petition shows prescription has run, the burden of proof shifts to the plaintiff to show prescription has not run. Lima v. Schmidt, 595 So.2d 624, 628 (La.1992); Niklaus, supra.
Because of the strict construction of prescription statutes, Louisiana courts recognize the doctrine of contra non valentem agere nulla currit praescripto ("contra non valentem"). Renfroe v. State ex rel. Department of Transportation and Development, XXXX-XXXX, pp. 8-9 (La.2/26/02), 809 So.2d 947, 953. Under the doctrine of contra non valentem, the running of prescription is suspended during the period in which the cause of action was not known by or reasonably knowable by the plaintiff. Bergeron v. Pan American Assur. Co., 98-2421, p. 9 (La.App. 4 Cir. 4/7/99), 731 So.2d 1037, 1042.
*772 In Wimberly v. Gatch, 93-2361 (La.4/11/94), 635 So.2d 206, 211, the Supreme Court set forth four categories in which prescription is usually suspended under the doctrine of contra non valentem:
(1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action;
(2) where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting;
(3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and
(4) where some cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.
See also, Bergeron v. Pan American Assur. Co., supra.
Although the first three categories are not relevant to this case, the plaintiffs' assertions fall squarely in the fourth: Ms. Bouma claims that she did not know, prior to April 1997, what was causing her ailments. Application of the fourth category of contra non valentem on a cause of action is dependent upon a finding that a plaintiff's ignorance of his or her rights and potential cause of action was not willful, negligent, or unreasonable. Id. Ms. Bouma maintains that as soon as she began to experience difficulties, she attempted to treat her symptoms with over-the-counter medications and sought medical assistance from Dr. Duffour. During her many consultations with Dr. Duffour, neither she nor Dr. Duffour ever concluded that her difficulties could be linked to her work environment. In fact, Dr. Duffour, in his deposition, stated that during one of Ms. Bouma's office visits, he ruled out the possibility that her asthma was related to any one specific cause.
Hermitage cites In re: Asbestos Plaintiffs v. Borden, Inc., XXXX-XXXX (La.App. 4 Cir. 8/14/02), 826 So.2d 581 as support for its assertion that plaintiffs' claims are prescribed. In Borden, one of the plaintiffs made a claim for, among other things, occupational asthma, which he contended he contracted while working at a number of shipyards over a twenty-year period. The trial court sustained an exception of prescription filed on the grounds that, although the plaintiff in question had suffered from symptoms related to his asthma as early as the mid-1970s, he did not file suit until October 1991. The plaintiff asserted that because he was not diagnosed with occupational asthma until 1991, prescription had not yet tolled on his claims. Hermitage asserts that, likewise, Ms. Bouma's manifestation of symptoms well prior to April 1997 and the ease of association between her symptoms and work environment are identical to the issues before the court in Borden.
Borden, however, is distinguishable on its facts. Although the plaintiff in Borden had manifested symptoms years before and finally being diagnosed with occupational asthma, there is nothing to suggest that he had suffered from any ongoing respiratory problems prior to his employment by the shipyards that might have confounded his ability to discern an onset of occupational asthma. Ms. Bouma, on the other hand, had suffered from pneumonia three times by the age of thirty-one and had a history of respiratory difficulties. It is not unreasonable for her to have failed to associate the exacerbation of her illness with her work environment and not as a worsening of an already-present condition, which she had described as similar to an ongoing cold.
*773 We conclude that the record and evidence presented at trial support the finding of the trial court that Ms. Bouma did not know of the cause of her illness until April 1997. Further, based upon the actions of Ms. Bouma, we do not find that she acted unreasonably or negligently. She tried to treat her symptoms, but to no avail. Thus, the argument proffered by Hermitage that Ms. Bouma was unreasonable is simply without merit. The plaintiffs' petition for damages was timely filed pursuant to the doctrine of contra non valentem.
CONCLUSION
After reviewing the record and evidence submitted at the trial of this matter, we find that the trial court did not err in assigning 100% liability to Hermitage, finding that the pollution exclusion clause contained in the Hermitage policy does not apply to the facts of this case, or in determining that the plaintiffs' claims are not prescribed.
AFFIRMED.
JONES, J., concurs in the result.
NOTES
[1] Our findings in this case are based upon the record on appeal. See La. C.C.P. art. 2128. It is apparent that certain pleadings and other filings in these consolidated cases were not made a part of the record on appeal.
[2] The statement that MLT Construction was doing business as Hibernia Roofing is based upon the Hermitage Insurance Company's brief to this court. Hermitage issued their policy of insurance to MLT Construction doing business as Hibernia Roofing.
[3] No assignment of error has been asserted with respect to any claim made by State Farm in this litigation.