THE LOUISIANA         *        NO. 2020-CA-0334
DEPARTMENT OF
ENVIRONMENTAL QUALITY    *

                             COURT OF APPEAL

VERSUS                  *

                             FOURTH CIRCUIT

TIDEWATER LANDFILL LLC    *
& THE LOUISIANA FRUIT                STATE OF LOUISIANA
COMPANY, ET AL       * * * * * * *

APPEAL FROM
25TH JDC, PARISH OF PLAQUEMINES
NO. 64-848, DIVISION "A"
Honorable Kevin D. Conner, Judge
* * * * * *
**Judge Dale N. Atkins**
* * * * * *
(Court composed of Judge Edwin A. Lombard, Judge Roland L. Belsome, Judge
Daniel L. Dysart, Judge Tiffany G. Chase, Judge Dale N. Atkins)

**BELSOME, J., DISSENTS FOR THE REASONS ASSIGNED BY JUDGE
DYSART**

**DYSART, J., DISSENTS**

Oscar Magee
Jill Carter
Gail C. Holland
Rodney Barnes
Amber G. Litchfield
LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY
Legal Affairs Division
P.O. Box 4302
Baton Rouge, LA 70821-4302

      COUNSEL FOR PLAINTIFF/APPELLANT

Sidney W. Degan, III
Travis L. Bourgeois
Karl H. Schmid
DEGAN BLANCHARD & NASH
400 Poydras Street
Suite 2600 Texaco Center
New Orleans, LA 70130


COUNSEL FOR DEFENDANT/APPELLEE

**REVERSED AND REMANDED**
**MARCH 24, 2021**

*DNA*
*EAL*
*TGC*

This is an insurance coverage dispute. Appellant, the Louisiana Department of Environmental Quality (the "LDEQ"), appeals the trial court's February 21, 2020 judgment, which granted a motion for summary judgment filed by Gray Insurance Co. ("Gray"), dismissed all claims against Gray, and found Gray had no obligation to provide insurance coverage under a pollution exclusion endorsement contained in Gray's insurance policy. For the reasons that follow, we reverse the trial court's judgment and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Louisiana Fruit Company ("LFC") co-owns property that it leased on May 1, 1991, to South Louisiana Environmental Control Company ("SLECC"), Tidewater Landfill, LLC ("Tidewater"), and Environmental Operators, Inc. ("Environmental Operators") for the use of a landfill in Venice, Plaquemines Parish, Louisiana. The term of the lease extends until July 1, 2021. Under the agreement, SLECC and Tidewater contracted with Environmental Operators for the installation, maintenance, operation, and closure of the landfill. On April 12, 1998, the LDEQ issued Permit P-0717 for the operation of the landfill. Permit P-0717 was renewed twice, on June 18, 1998 and July 19, 2011, respectively. The permit required,

among other things, that the operators of the landfill maintain a certain amount in trust to cover costs associated with operating and closing the landfill in accordance with certain regulations promulgated by the LDEQ. Tidewater and Environmental Operators maintained insurance policies with several insurance companies, one of which is Gray.

On October 12, 2018, the LDEQ filed a Petition for Mandatory Injunction to Abate a Continuing Nuisance (the "Petition"), naming, among others, LFC, SLECC, Tidewater, Environmental Operators, and Gray as defendants. The LDEQ alleged that the landfill operations were governed by La. R.S. 30:2151 *et seq.*, Louisiana's Solid Waste Management and Resource Recovery Law, and LAC 33:VII.101 *et seq.*, Louisiana's Solid Waste Regulations. According to the Petition, these statutes and regulations were designed to prevent environmental damage caused by past waste disposal practices, and established standards for the storage, collection, processing, recycling, and disposal of solid waste.

The LDEQ further alleged that, as of October 1, 2015, Tidewater estimated that the closure costs for the Type I and II Disposal Footprint of the landfill were $793,494.28 and that the cost of post-closure care was $775,086. The estimated closure costs for the Type III Disposal Footprint of the landfill were $208,285.20 and post-closure care costs were $31,260.00, for a total of $1,808,125.48. The LDEQ also alleged that Tidewater only had $660,000 of available financial assurance in trust, which was inadequate to cover the costs of closure and post-closure care of the landfill.

In the Petition, the LDEQ noted that, pursuant to its regular inspections of the landfill, Tidewater was not compliant with the regulatory financial assistance requirements, nor was it compliant with other rules and regulations regarding

2

maintenance of the landfill, such as failing to provide adequate daily cover of solid waste going back to November 1997. The LDEQ also alleged that Tidewater was allowing leachate from the landfill to run into waters of the State, which was a nuisance and was causing danger to human health and the environment. Accordingly, because Tidewater had continued to dispose of solid waste at the landfill in violation of La. R.S. 30:2155, the LDEQ prayed for an injunction to issue against Tidewater. The injunction the LDEQ sought would mandate that Tidewater comply with La. R.S. 30:2155, the Louisiana Environmental Quality Act, the Louisiana Solid Waste Regulations, and all applicable permits and orders to properly close the landfill and maintain the landfill in post-closure care.

At issue in this appeal is Gray's Commercial General Liability ("CGL") insurance policy number XSGL-072472 (the "Primary Policy"), under which Environmental Operators and Tidewater are identified as named insureds. Gray issued excess policy numbers GXS-040627, GXS-040692, GXS-040758, XSWC-060867, and XSAL-072271, which covered Tidewater and Environmental Operators as named insureds for consecutive yearly policy periods from January 1, 1993 to January 1, 2016.

The Primary Policy specified that Gray would "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies" and that Gray would "have the right and duty to defend any 'suit' seeking those damages." The Primary Policy included a total pollution exclusion endorsement, issued on December 29, 1992, and effective January 1, 1993, which stated:

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

3

Exclusion f. under COVERAGE A (Section I) is replaced by the following:

\*\*\*

(2) Any loss, cost or expense arising out of any:

(a) **Request, demand or order** that any insured or others test for, monitor, **clean up, remove**, **contain**, treat, detoxify, or neutralize, **or in any way respond to or assess the effects of pollutants**; or

(b) **Claim or suit by or on behalf of a governmental authority for damages** because of testing for monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects or pollutants.

Pollutants means **any solid, liquid, gaseous, or thermal irritant or contaminant including** smoke vapor, soot, fumes, acid, alkalis, chemicals and **waste**. **Waste includes material to be recycled, reconditioned or reclaimed**. (Emphasis added).

The policies also included a Seepage and Pollution Buy-Back ("72 Hour Clause"), which stated:

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

Notwithstanding the Seepage and Pollution Exclusions contained in Paragraph (1) of Exclusion f of COVERAGE A (Section 1) of the COMMERCIAL GENERAL LIABILITY COVERAGE PART, these shall not apply provided that the Assured establishes that all of the following conditions have been met:

A. The occurrence was sudden and accidental and was neither expected nor intended by the Assured. An accident shall not be considered unintended or unexpected unless caused by some intervening event, neither expected or intended by the Assured.

B. The occurrence can be identified as commencing at a specific time and date during the term of this policy.

C. The occurrence became known to the Assured within 72 hours after its commencement and was reported to Underwriters within 90 days thereafter.

4

D. The occurrence did not result from the Assured's intentional or willful violation of any government statute, rule or regulation.

On December 2, 2019, Gray filed a motion for summary judgment, arguing that it had no duty to provide insurance coverage for the LDEQ's claims against Environmental Operators and Tidewater due to the total pollution exclusion endorsement in the Primary Policy. In the motion, Gray admitted that it had issued the Primary Policy and the excess policies and that Tidewater and Environmental Operators are named insureds under the policies. Gray argued, however, that the LDEQ's theories of recovery and allegations against Tidewater and Environmental Operators all arise from, and are the direct result of, long-term contamination and pollution damages resulting from the operation of a waste-disposal site. Accordingly, Gray contended, the total pollution exclusion unambiguously excluded coverage for all of the LDEQ's claims. In support of its motion for summary judgment, Gray attached the Primary Policy, the excess policies, and an affidavit of Floyd Sibley, Gray's Assistant Vice President-Claims, who attested that no sudden and accidental "occurrence" or any other covered incident (as it relates to the LDEQ's claims in the instant litigation), was ever reported to Gray during any of the applicable policy periods.

The LDEQ filed an opposition to the motion for summary judgment. On February 21, 2020, the trial court granted the motion for summary judgment, and dismissed all claims against Gray with prejudice. From this judgment, the LDEQ timely appeals.

**DISCUSSION**

On appeal, the LDEQ assigns two errors. First, the LDEQ argues that, because its claim for abatement of a nuisance is in the form of a mandatory

5

injunction, rather than a suit for damages, it does not fall under the terms of the total pollution exclusion endorsement found in the Primary Policy, and the trial court erred in finding the exclusion applied. Second, the LDEQ argues that genuine issues of material fact remain concerning the necessary remedies to abate the nuisance, which in turn govern whether the total pollution exclusion endorsement applies and whether summary judgment was appropriate.

Gray counters that the trial court correctly granted the motion for summary judgment. Gray contends that the total pollution exclusion applies because the LDEQ's suit for a mandatory injunction to abate the nuisance caused by the landfill amounts to a "cost or expense" from a "[r]equest, demand or order that any insured…clean up, remove…or in any way respond to or assess the effects of pollutants" that falls squarely within the terms of the total pollution exclusion endorsement. Gray also maintains that the trial court properly granted its motion for summary judgment because no genuine issues of material fact remain as to whether the LDEQ's claims are excluded by the total pollution exclusion endorsement in the Primary Policy.

### Standard of Review and the Interpretation of Insurance Policies and Exclusions

At the outset, we note that summary judgment is favored in Louisiana, and it is designed to secure the just, speedy, and inexpensive determination of every action. La. C.C.P. art. 966(A)(2). Appellate courts review summary judgments *de novo* using the same criteria that govern the district court's consideration of whether summary judgment is appropriate. *Elliott v. Continental Cas. Co.*, 2006-1505, p. 10 (La. 02/22/07), 949 So.2d 1247, 1253; *see also Madere v. Collins*, 2017-0723, p. 6 (La. App. 4 Cir. 3/28/18), 241 So.3d 1143, 1147, *writ denied*, 2018-0678 (La. 9/14/18), 252 So.3d 478. A motion for summary judgment will be

6

granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue of material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).

The motion for summary judgment in the instant matter turns on the language contained in the Primary Policy and the total pollution exclusion endorsement. Accordingly, the standard by which insurance policies are examined in the context of a motion for summary judgment is important.

"An insurance policy is a contract between the parties and should be construed employing the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *Elliott*, 2006-1505, p. 11, 949 So.2d at 1253-54 (quoting *Reynolds v. Select Properties, Ltd.*, 1993-1480 (La. 4/11/94), 634 So.2d 1180, 1183). "The parties' intent, as reflected by the words of the policy, determine the extent of coverage. Words and phrases used in a policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning." *Id.*, 2006-1505, p. 11, 949 So.2d at 1254.

Nonetheless, "[a]n insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion." *Id*. Therefore, "[w]here the language in the policy is clear, unambiguous, and expressive of the intent of the parties, the agreement must be enforced as written." *Id*. "However, if after applying the other rules of construction an ambiguity remains, the ambiguous provision is to be construed against the drafter and in favor of the insured." *Id*. Because the purpose of liability insurance is to provide the insured protection from damage claims, "policies therefore should

7

be construed to effect, and not to deny, coverage." *Id.* Accordingly, "a provision which seeks to narrow the insurer's obligation is strictly construed against the insurer, and, if the language of the exclusion is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied." *Id.*

The rules of construction, however, "do[] not authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists, nor does it authorize the court to make a new contract for the parties or disregard the evidence as expressed, or to refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties." *Id.* (quoting C*ommercial Union Insurance Co. v. Advance Coating Co.*, 351 So.2d 1183, 1185 (La. 1977)) (internal citation omitted).

Generally, "it is the burden of the insured to prove the incident falls within the policy's terms." *Doerr v. Mobil Oil Corp.*, 2000-0947, p. 5 (La. 12/19/00), 774 So.2d 119, 124. The insurer, however, "bears the burden of proving the applicability of an exclusionary clause within a policy." *Id.*

Importantly, an insurer's duty to defend is broader than just its liability for damage claims, and it is determined by the allegations of the plaintiff's petition, with the insurer being obligated to furnish a defense unless the petition unambiguously excludes coverage. *Perniciaro v. McInnis*, 2018-0113, p. 10 (La. App. 4 Cir. 9/7/18), 255 So.3d 1223, 1231, *writ denied*, 2018-1659 (La. 12/17/18), 259 So.3d 342 (citing *Plaia v. Stewart Enterprises, Inc.*, 2014-0159, p. 35 (La. App. 4 Cir. 10/26/16), 229 So.3d 480, 504)(internal citations omitted). Thus, the "eight-corners rule" is applied to determine if an insurer has a duty to defend, wherein "an insurer must look to the 'four corners' of the plaintiff's petition and the 'four corners' of its policy to determine whether it owes that duty." *Id.* In

8

applying the "eight-corners rule," the factual allegations of the plaintiff's petition must be liberally interpreted to determine if they set forth grounds that raise the possibility of coverage under the policy. *Id.* "In other words, the test is not whether the allegations unambiguously assert coverage, but rather whether they do not unambiguously exclude coverage." *Id.*

Summary judgment which declares a lack of coverage may not be rendered unless there is no reasonable interpretation of the insurance policy under which coverage could be afforded when the undisputed material facts shown by the evidence supporting the motion are applied. *Elliott*, 2006-1505, p. 10, 949 So.2d at 1253 (citing *Reynolds*, 1993-1480 (La. 4/11/94), 634 So.2d 1180, 1183).

### *The Applicability of the Total Pollution Exclusion Endorsement*

It is against this backdrop that we review the trial court's judgment *de novo*. Because the insurer, Gray, seeks to invoke the applicability of the total pollution exclusion endorsement to exclude coverage of the LDEQ's claim for injunction to abate the nuisance of the landfill, it is Gray's burden to show that the exclusion applies. In our *de novo* review of the judgment granting the motion for summary judgment, this Court must look to the factual allegations in the LDEQ's petition along with the Primary Policy and the total pollution exclusion endorsement to determine if the LDEQ's claims are unambiguously excluded.

The parties do not dispute that Gray is Tidewater's and Environmental Operators insurer, nor do the parties dispute that the claims the LDEQ brought fall within the time period covered by the Primary Policy. The LDEQ argues that the trial court erred in granting the motion for summary judgment because it brought a suit for an injunction to have the trial court order the closure of the landfill and

9

provide proper post-closure care—rather than a suit for damages—and the total pollution exclusion endorsement does not apply.

Gray counters that, regardless of the type of relief the LDEQ seeks, the claims presented fall within the total pollution exclusion endorsement's terms because they are "loss[es], cost[s] or expense[s]" arising out of "request[s], demand[s] or order[s] that any insured…clean up, remove…or in any way respond to…the effects of pollutants" under section (2)(a) of the total pollution exclusion endorsement. Gray notes that the solid waste coming from the landfill meets the definition of "pollutant" and thus, the total pollution exclusion endorsement applies. Gray also argues that the instant action falls within section (2)(b) of the total pollution exclusion endorsement as being a "[c]laim or suit by or on behalf of a governmental authority for damages."

The LDEQ's argument regarding its claim for injunction versus a claim for damages has merit only as to section (2)(b), wherein the exclusion applies to "claim[s] or suit[s] on behalf of a governmental authority for damages." There is no dispute that the LDEQ is a governmental authority as a department of the State. Despite Gray's arguments to the contrary, however, the LDEQ does not make a claim for damages to have the nuisance abated. It merely asks the trial court to order the closure of the landfill so the nuisance caused by the landfill's pollutants will cease.

Nevertheless, regardless of whether the LDEQ seeks an injunction or damages, its claim for nuisance abatement will practically amount to a "cost or expense" arising out of an order (here, an injunction) for the insured (here, Tidewater) to abate, clean up, or remove the nuisance of the landfill. The LDEQ makes it clear in the Petition that closure and post-closure care of the landfill has a

10

significant cost for which Tidewater does not have adequate funds in trust. Therefore, practically speaking, and interpreting the LDEQ's claims liberally as required by the "eight-corners rule" and *Plaia, supra*, even if the LDEQ did not assert a claim for damages, its request amounts to a cost or expense for the removal and cleaning up of the landfill.

Importantly, however, the plain language of the total pollution exclusion endorsement excludes "cost or expense" arising out of an order for the insured to clean up or remove "or in any way respond to or assess the *effects* of pollutants." (Emphasis added). Here, it cannot be said that the total pollution exclusion unambiguously includes the costs associated with closing the landfill as being an "effect" of a pollutant (rather than a pollutant itself), and this Court cannot say that the total pollution exclusion endorsement in the Primary Policy unambiguously excludes coverage. Stated another way, if the LDEQ was seeking costs to clean or repair the adjacent waters and property into which the landfill's solid waste is infiltrating or damages from the infiltration, the repairs and damages sought would be "effects" caused by the "pollutant" waste. Thus, the LDEQ's claims would be excluded under the Primary Policy. However, the closure of the landfill itself cannot conclusively be said to be an "effect" of a pollutant.

In making this distinction, the Court is mindful of its decision in *Orleans Par. Sch. Bd.*, 2012-0095 (La. App. 4 Cir. 8/28/13), 123 So.3d 787. In *Orleans Par. Sch. Bd.*, the plaintiff sought coverage from its insurers for mold on its property that was caused by Hurricane Katrina. This Court found that the trial court improperly granted summary judgment by finding that a total pollution exclusion endorsement was applicable because the endorsement excluded coverage for losses *caused by* a pollutant (mold), rather than losses that *were* mold. *Id.*,

11

2012-0095, p. 31, 123 So.3d at 804. This Court held that there are distinct differences between losses caused by mold and mold as a loss. *Id.*, 2012-0095, pp.16-17, 123 So.3d at 796. This Court further found that the modifying language "caused by" precluded the application of the exclusion endorsement to all of the plaintiff's claims, and remanded to the trial court for a determination on which losses were caused by mold and which losses were mold. *Id.*, 2012-0095, pp. 31-32, 123 So.3d at 804-05. Like the claims presented in *Orleans Par. Sch. Bd.*, the claims presented here cannot be unambiguously said to be excluded under the Primary Policy.

This Court is also mindful of the Louisiana Supreme Court's decision in *Doerr*, *supra*, wherein the Louisiana Supreme Court stated that, given the "ambiguous nature and absurd consequences which attend a strict reading of [pollution exclusion] provisions, we now find that the total pollution exclusion was neither designed nor intended to be read strictly to exclude coverage for all interactions with irritants or contaminants of any kind" and that it is appropriate to construe a pollution exclusion clause "in light of its general purpose, which is to exclude coverage for environmental pollution." 2000-0947, p. 25, 774 So.2d at 135. Accordingly, this Court must analyze the Primary Policy and the total pollution exclusion endorsement to determine if the parties contemplated that the Primary Policy would specifically exclude the type of claim that is presented here, specifically one to abate a nuisance under La. C.C. art. 667.

The *Doerr* court held that, in determining whether a total pollution exclusion should apply, several considerations must be taken into account, including: "(1) [w]hether the insured is a "polluter" within the meaning of the exclusion; (2) [w]hether the injury-causing substance is a "pollutant" within the meaning of the

12

exclusion; and (3) [w]hether there was a "discharge, dispersal, seepage, migration, release or escape" of a pollutant by the insured within the meaning of the policy." *Id*. The *Doerr* court clarified that all three of these factors are fact-based conclusions. *Id*., 2000-0947, p. 26, 774 So.2d at 135.

This Court analyzed *Doerr*'s decision in the context of claims related to personal injuries, consisting of an aggravated allergic reaction to mold, mildew, and other allergens allegedly introduced into the plaintiff's work environment by an influx of water at the building where the plaintiff was employed in *State Farm Fire & Cas. Co. v. M.L.T. Const. Co., Inc.*, 2002-1811, 2002-1812 (La. App. 4 Cir. 6/4/03), 849 So.2d 762. In *State Farm*, this Court reiterated that the *Doerr* factors are factual issues. *Id*., 2002-1811, p. 11, 849 So.2d at 770. The first factor includes an examination of:

> [T]he type of business in which the insured is engaged and whether that business presents a risk of pollution; whether the disputed claims are covered by any other policy; whether the insured should have known from a reading of the policy that a separate policy covering pollution damages would be necessary for the business; who the insurer typically insures; any other claims made under the policy; and any other factor the trier of fact deems relevant to the inquiry.

> *Id.*

As to the second factor, this Court held that a trier of fact should consider:

> [T]he nature of the injury-causing substance, its typical usage, the quantity of the discharge, whether the substance was being used for its intended purpose when the injury took place, whether the substance is one that would be viewed as a pollutant as the term is generally understood, and any other factor that the trier of fact deems relevant to that conclusion.

> *Id.* (quoting *Doerr*, 2000-0947, p. 26, 774 So.2d at 135).

13

As to the third *Doerr* factor, "the trier of fact should consider whether the pollutant was intentionally or negligently discharged, the amount of the injury-causing substance discharged, whether the actions of the alleged polluter were active or passive, and any other facts relevant to the inquiry." *Id.*, 2002-1811, p. 12, 849 So.2d at 771. Finding that the complained-of pollutant was an influx of rainwater that resulted in mold and mildew growth, in *State Farm*, this Court upheld the trial court's determination that the total pollution exclusion endorsement did not exclude coverage for the plaintiff's claims.

The record supports the finding that Tidewater is a "polluter" within the meaning of the total pollution exclusion endorsement. Indeed, Tidewater operates a landfill, which the LDEQ claims is a nuisance that is polluting nearby waters and properties with solid waste. However, the second *Doerr* prong—that of whether the injury-causing substance is a "pollutant" within the meaning of the total pollution exclusion endorsement—is not met. As in *State Farm*, the leachate is formed by the falling of rainwater on the landfill (due to the improper coverage of the landfill), which then creates the nuisance of the landfill and endangers state waters, neighboring property, and human life. Thus, as the LDEQ points out, the leachate was caused by the nuisance of the landfill rather than the leachate being the nuisance or the "pollutant."

Additionally, even if the substances and waste coming from the landfill meet the definition of "pollutant" in both *Doerr* and the language of the Primary Policy, the plain language of the total pollution exclusion endorsement specifically applies to "effects" of pollutants. The record does not contain any indication of whether the nuisance caused by the landfill that the LDEQ seeks to have abated is a

14

"pollutant" itself not excluded by the Primary Policy or if it is an "effect" of a pollutant that is excluded by the Primary Policy.

Recently, the Third Circuit Court of Appeal articulated the well-settled notion that "[t]he purpose of liability insurance…is to afford the insured protection from damage claims. Policies should be construed to effect, not deny, coverage." *Wise v. O'Neil*, 2020-00003, p. 11 (La. App. 3 Cir. 6/17/20), 299 So.3d 185, 193, *reh'g granted in part*, 2020-00003 (La. App. 3 Cir. 12/9/20) (citing *Borden, Inc. v. Howard Trucking Co., Inc.*, 454 So.2d 1081, 1090 (La. 1984); *LeJeune v. Allstate Ins. Co.*, 365 So.2d 471, 479 (1978)). Thus, "an exclusion from coverage should be narrowly construed." *Id.* (citing *Snell v. Stein*, 261 La. 358, 259 So.2d 876 (1972)).

Taking into account the purpose of liability insurance, the narrow construction of exclusions, and that any ambiguity in the policy should be resolved in favor of the insured to include coverage, this Court cannot say that the total pollution exclusion endorsement unambiguously precludes coverage. Likewise, we cannot say that there is no reasonable interpretation of the Primary Policy and the total pollution exclusion endorsement under which coverage could be afforded when the undisputed material facts shown by the evidence supporting the motion are applied. Therefore, this Court reverses the trial court's judgment granting the motion for summary judgment.

We recognize that this decision is a departure from the Second Circuit's recent decision in *Kansas City S. Ry. Co. v. Wood Energy Grp., Inc.*, 53,096, 53,099 (La. App. 2 Cir. 1/15/20), 289 So.3d 671. In *Kansas City*, the LDEQ issued demand letters to the plaintiffs, insisting that they remediate the sites where the plaintiffs recycled creosote-treated wooden rail crossties. The LDEQ demanded that the remediation include removal and proper disposal of solid wastes at the site,

15

the design and implementation of a remedial site investigation, and the design and implementation of any corrective actions necessary to address potential contamination of soil and/or groundwater at the facility. After remediating the site, plaintiffs brought a lawsuit against their insurers claiming they were liable to them for the costs of the remediation. The insurers brought motions for summary judgment denying coverage due to total pollution exclusion endorsements in their insurance policies, which are virtually identical to the ones here issued by Gray. *Id.*, 53,096, p. 12, 289 So.3d at 679.

The trial court denied the motions for summary judgment and the Second Circuit reversed. The Second Circuit found that "the pollution exclusion states the policy does not apply to any loss, cost, or expense arising from any '[r]equest, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants'" and that, because "[t]hat is the essence of what the LDEQ demanded the Railroads do and how they incurred their losses in this matter," summary judgment was proper. *Id*., 53,096, p. 16, 289 So.3d at 681.

The Second Circuit's decision in *Kansas City* seems to ignore the "effects of pollutants" language that was found in the insurance policies in that case that are also found in the instant matter. Based on the record before us, we cannot say that the total pollution exclusion endorsement unambiguously excludes coverage of the claims in the instant matter. Accordingly, we decline to follow the ruling in *Kansas City*.

16

**DECREE**

For the foregoing reasons, we reverse the trial court's ruling granting Gray's motion for summary judgment and remand this matter for further proceedings.

**REVERSED AND REMANDED**